# MINNIE SUE RYON *v.* STATE OF MARYLAND

[No. 376 (On Remand), September Term, 1973.]

*Decided November 26, 1975.*

The cause was argued before ORTH, C. J., and DAVIDSON and LOWE, JJ.

*Karl G. Feissner, Assigned Public Defender,* with whom were *Feissner, Garrity, Levan & Schimel* and *Edward P. Camus, District Public Defender for Prince George's County,* on the brief, for appellant.

*James G. Klair, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Joseph C. Sauerwein, Deputy State's Attorney for Prince George's County,* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

## WONG SUN v. UNITED STATES

On 14 January 1963 the Supreme Court of the United States decided *Wong Sun v. United States,* 371 U. S. 471, 83 S. Ct. 407. The Court pronounced the principles to be applied where the issue is whether statements and other evidence obtained after an illegal arrest or search should be excluded. "[F]ederal agents elicited an oral statement from defendant Toy after forcing entry at 6 a.m. into his laundry at the back of which he had his living quarters. The agents had followed Toy down the hall to the bedroom and there had placed him under arrest.[1] * * * Toy's statement, which bore upon his participation in the sale of narcotics, led the agents to question another person, Johnny Yee, who actually possessed narcotics. Yee stated that heroin had been brought to him earlier by Toy and another Chinese known to him only as 'Sea Dog'. Under questioning, Toy said that 'Sea Dog' was Wong Sun. Toy led agents to a multifamily dwelling where, he said, Wong Sun lived. Gaining admittance to the building through a bell and buzzer, the agents climbed the

---

[1]. The United States Court of Appeals found, and the Supreme Court agreed, that there was no probable cause for Toy's arrest.

stairs and entered the apartment. One went into the back room and brought Wong Sun out in handcuffs. After arraignment, Wong Sun was released on his own recognizance. Several days later, he returned voluntarily to give an unsigned confession. [The Supreme Court] ruled that Toy's declarations and the contraband taken from Yee were the fruits of the agents' illegal action and should not have been admitted as evidence against Toy. [371 U. S.] at 484-488, 83 S. Ct. at 416. It held that the statement did not result from 'an intervening independent act of a free will,' and that it was not 'sufficiently an act of free will to purge the primary taint of the unlawful invasion' *Id.*, at 486, 83 S. Ct. at 416. With respect to Wong Sun's confession, however, the Court held that in the light of his lawful arraignment and release on his own recognizance, and of his return voluntarily several days later to make the statement, the connection between his unlawful arrest and the statement had 'become so attenuated as to dissipate the taint. *Nardone v. United States*, 308 U. S. 338, 341, 60 S. Ct. 266, 84 L. Ed. 307.' Id., at 491, 83 S. Ct. at 419." [2] The key to the holding in *Wong Sun* is in this statement by the Court, 371 U. S. at 487-488, 83 S. Ct. at 417:

> " 'We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959).' "

The Court in *Brown v. Illinois*, 95 S. Ct. 2254, 2259-2260 (1975), explained the *Wong Sun* holding:

> "The exclusionary rule thus was applied in *Wong*

---

2. This summary of the facts and holdings in *Wong Sun* is as set out in Brown v. Illinois, 95 S. Ct. 2254, 2259 (1975).

*Sun primarily* to protect Fourth Amendment rights. Protection of the Fifth Amendment right against self-incrimination was not the Court's paramount concern there. To the extent that the question whether Toy's statement was voluntary was considered, it was only to judge whether it 'was *sufficiently* an act of free will to purge the primary taint of the unlawful invasion.' 371 U.S. at 486, 83 S. Ct. at 416 (emphasis added)."

The Court in *Wong Sun* made clear that "verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion. . . . Nor do the policies underlying the exclusionary rule invite any logical distinction between physical and verbal evidence. Either in terms of deterring lawless conduct by federal officers, . . . or of closing the doors of the federal courts to any use of evidence unconstitutionally obtained, . . . the danger in relaxing the exclusionary rules in the case of verbal evidence would seem too great to warrant introducing such a distinction." 371 U. S. at 485-486.

## *MIRANDA v. ARIZONA*

*Wong Sun* left the basic law relating to admissibility of confessions unchanged. The question upon challenge of a confession was simply whether the statement offered was "voluntary". In state cases the Supreme Court applied the Due Process Clause of the Fourteenth Amendment, examining the circumstances of interrogation to determine whether the processes were so unfair or unreasonable as to render a subsequent confession involuntary. See, *e.g.*, *Haynes v. Washington*, 373 U. S. 503 (1963); *Payne v. Arkansas*, 356 U. S. 560 (1958); *White v. Texas*, 310 U. S. 530 (1940); *Brown v. Mississippi*, 297 U. S. 278 (1936). Where the State's actions offended the standards of fundamental fairness under the Due Process Clause, the State was then deprived of the right to use the resulting confessions in

court. This traditional test of voluntariness was the rule of Maryland. "The basic standard governing the admissibility of extra-judicial statement is whether, considering the totality of the circumstances, the statement was voluntary." *Robinson v. State,* 3 Md. App. 666, 671 (1968), citing *Taylor v. State,* 238 Md. 424 (1965) and *McFadden v. State,* 1 Md. App. 511 (1967).[3]

It was not until the decision of the Supreme Court in *Miranda v. Arizona,* 384 U. S. 436, decided 13 June 1966, that the privilege against compulsory self-incrimination, a privilege made applicable to the States in *Malloy v. Hogan,* 378 U. S. 1 (1964), was seen as the principal protection for a person facing police interrogation. The Court in *Miranda,* for the first time, expressly declared that the Self-Incrimination Clause was applicable to state custodial interrogations, and that an accused's statements might be excluded at trial despite their voluntary character under traditional principles. *Michigan v. Tucker,* 94 S. Ct. 2357, 2363 (1974). *Miranda* established a set of specific protective guidelines, commonly known as the *Miranda* rules or warnings. In post-*Miranda* trials, where the State seeks to introduce a statement taken from an accused during custodial interrogation, it must, as part of its proof of voluntariness, affirmatively show that all the *Miranda* warnings required to be given were in fact given, and that the accused, in giving

---

**3.** We said in *Robinson* at 670-671:

"It is well settled that in order for a confession to be admissible into evidence against an accused, the State must prove that it was voluntary and not the product of force, threats, promises or inducements. Abbott v. State, 231 Md. 462; Cooper v. State, 1 Md. App. 190. Otherwise stated, to be voluntary, a statement cannot be 'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.' Malloy v. Hogan, 378 U. S. 1, 7; Lyter v. State, 2 Md. App. 654."

Koprivich v. State, 1 Md. App. 147, 151 (1967), we put it this way, citing Hadder v. State, 238 Md. 341 (1965); Wiggins v. State, 235 Md. 97 (1964); Bryant v. State, 229 Md. 531 (1962):

"[T]he test by which the court is to measure the admissibility of an extrajudicial statement (or confession) is whether the statement was made freely and voluntarily and at a time when the accused knew and understood what she was saying."

the statement, understood his rights and knowingly and intelligently waived them.

## MICHIGAN v. TUCKER

The Supreme Court decided *Michigan v. Tucker*, 417 U. S. 433 on 10 June 1974. We know now, in the light of *Tucker*, that failure to give all the *Miranda* warnings does not necessarily abridge the privilege against self-incrimination. *Tucker* tells us, at 444, that the Court in *Miranda* "recognized that these procedural safeguards were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected. . . . The suggested safeguards were not intended to 'create a constitutional straitjacket,' [384 U. S., at 467], but rather to provide practical reinforcement for the right against compulsory self-incrimination." Thus, evidence obtained without full compliance with the *Miranda* dictates is not, for that reason, always to be excluded. So, in *Tucker*, the failure to advise an accused during a custodial interrogation, held prior to the *Miranda* decision, of his right to appointed counsel, did not in the circumstances existent, infringe against the right against compulsory self-incrimination but only violated the prophylactic rules developed to protect that right. Therefore, the use of the testimony of a witness discovered by the police as a result of the accused's statements did not violate any requirements under the Fifth, Sixth and Fourteenth Amendments, relating to the adversary system. Prior to *Tucker*, in *Harris v. New York*, 401 U. S. 222 (1971), the Court held that a statement of the defendant himself, taken without informing him of his right of access to appointed counsel, could be used to impeach defendant's direct testimony at trial. *Id.*, at 224.[4]

---

4. The Court explained, in *Harris*, at 224:

"Some comments in the *Miranda* opinion can indeed be read as indicating a bar to use of an uncounseled statement for any purpose, but discussion of that issue was not at all necessary to the Court's holding and cannot be regarded as controlling. *Miranda* barred the prosecution from making its case with statements of an

From *Wong Sun* through *Tucker,* the rule appeared to be that verbal evidence is not always to be excluded because it derived from an illegal detention (and thus resulted from an unreasonable search and seizure) or because it was obtained without full observance of the *Miranda* prophylactic safeguards.[5] It is when the fruits of police misconduct actually infringe upon a defendant's Fourth and Fifth Amendment rights that they must be suppressed. There were, to be sure, areas which required explication. In *Morales v. New York,* 396 U. S. 102, 105-106 (1969), the Court said: "In any event, in the absence of a record that squarely and necessarily presents the issue and fully illuminates the factual context in which the question arises, we choose not to grapple with the question of the legality of custodial questioning on less than probable cause for a full-fledged arrest." [6]

## BROWN v. ILLINOIS

*Brown v. Illinois,* 95 S. Ct. 2254, decided 26 June 1975, was a case lying at the crossroads of the Fourth and Fifth Amendments. The accused was arrested without probable cause and without a warrant. He was given, in full, the *Miranda* warnings. Thereafter, while in custody, he made two inculpatory statements. It was because of the Court's concern about the implication of its holding in *Wong*

---

accused made while in custody prior to having or effectively waiving counsel. It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards."

5. The Court said in *Tucker,* at 446:

"Just as the law does not require that a defendant receive a perfect trial, only a fair one, it cannot realistically require that policemen investigating serious crimes make no errors whatsoever."

6. The Court noted, 396 U. S. at 105: "Given an opportunity to develop in an evidentiary hearing the circumstances leading to the detention of Morales and his confessions, the State may be able to show that there was probable cause for an arrest or that Morales' confrontation with the police was voluntarily undertaken by him or that the confessions were not the product of illegal detention."

*Sun* to the facts in Brown's case, that it granted certiorari. The opinion of the Court [7] defined the issue thus, at 2256:

> "The issue is whether evidence of those statements was properly admitted, or should have been excluded, in petitioner's subsequent trial for murder in state court. Expressed another way, the issue is whether the statements were to be excluded as the fruit of the illegal arrest, or were admissible because the giving of the Miranda warnings sufficiently attenuated the taint of the arrest." [8]

The Illinois courts refrained from resolving the question, which the Supreme Court noted was as apt in the case before it as it was in *Wong Sun,* whether Brown's statements were obtained by exploitation of the illegality of his arrest. Observing that *Wong Sun* preceded *Miranda,* the Court said that the Illinois courts "assumed that the *Miranda* warnings, by themselves, assured that the statements (verbal acts as contrasted with physical evidence) were of sufficient free will as to purge the primary taint of the unlawful arrest." 95 S. Ct. at 2260. The Court held that the statements were inadmissible. It emphasized that its holding was a limited one. "We decide only that the Illinois courts were in error in assuming that the *Miranda* warnings, by themselves, under *Wong Sun* always purge the taint of an illegal arrest." *Id.,* at 2262-2263. But what it said in reaching the holding is of the utmost significance.

The Court made clear that "exclusion of a confession made without *Miranda* warnings might be regarded as necessary to effectuate the Fifth Amendment, but it would not be sufficient fully to protect the Fourth. *Miranda* warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a Fourth Amendment violation." *Id.,*

---

**7.** The opinion of the Court was delivered by Mr. Justice Blackmun. Mr. Justice White concurred in the judgment and filed an opinion. Mr. Justice Powell concurred in part and filed an opinion in which Mr. Justice Rehnquist joined.

**8.** The Court referred to *Wong Sun* and noted that the Fourth Amendment had been held to be applicable to the states through the Fourteenth Amendment, citing Mapp v. Ohio, 367 U. S. 643 (1961).

at 2260-2261. Even if the statements were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue may remain. "In order for the causal chain, between the illegal arrest and the statements made subsequent thereto to be broken, *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.' * * * *Wong Sun* thus mandates consideration of a statement's admissibility in light of the distinct policies and interests of the Fourth Amendment." *Id.*, at 2261. The Court went on to explain why the exclusionary rule would be substantially diluted if the *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation. It then rejected the *per se* rule the Illinois courts appeared to have accepted, but also declined to adopt any alternative *per se* or "but for" rule, *id.*, at 2261:

> "The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test."

It discussed, id., at 2261-2262, what is to be considered in determining the question of admissibility of a statement obtained after an illegal detention, see *infra*, pointing out that the burden of admissibility rests, of course, on the prosecution.[9]

---

**9.** The Court's approach was characterized by it as one which "relies heavily, but not excessively, on the 'learning, good sense, fairness and courage of federal trial judges.' " *Id.*, n. 10, at 2262. We assume that the Court recognizes these traits in state judges also.

The Court found that the record before it was sufficient to ascertain that the State failed to sustain its burden of showing that the evidence was admissible under Wong Sun, *id.*, at 2262:

> "Brown's first statement was separated from his illegal arrest by less than two hours, and there was no intervening event of significance whatsoever. In its essentials, his situation is

### SUMMARY

The teachings of *Wong Sun* and *Miranda,* as explicated in *Tucker* and *Brown,* are clear.

1) The Fourth Amendment exclusionary rule applies equally to statements and tangible evidence obtained following an illegal arrest or an otherwise illegal search and seizure.

2) Such statements are not rendered inadmissible simply because of the illegal arrest or unreasonable search and seizure.

3) Such statements are not rendered admissible simply because the *Miranda* warnings were fully given.

4) Admissibility of such statements, *vel non,* must be answered on the facts of each case, upon consideration of:

    (a) the voluntariness of the statement, which is a threshold requirement;

    (b) compliance with the *Miranda* safeguards, which is important in determining whether the statements were obtained by exploitation of the illegal conduct;

    (c) other relevant factors, such as

        (i) the temporal proximity of the arrest and the confession;

        (ii) the presence of intervening circumstances; and

---

remarkably like that of James Wah Toy in Wong Sun. We could hold Brown's first statement admissible only if we overrule Wong Sun. We decline to do so. And the second statement was clearly the result and the fruit of the first.

The illegality here, moreover, had a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was 'for investigation' or for 'questioning.' The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion." (footnotes and references omitted).

(iii) "particularly, the purpose and flagrancy
of the official misconduct."

## MINNIE SUE RYON vs STATE OF MARYLAND — THE CASE SUB JUDICE

*Statement of the Case*

On 8 December 1971 the Grand Jury for Prince George's County returned a seventeen count indictment against Minnie Sue Ryon, Howard Davis Brown, Jr., and Thomas Edward Tennant. The 1st count presented that they feloniously, wilfully and of deliberately premeditated malice aforethought did murder Samuel Garner Ryon (Minnie Sue Ryon's husband) on 6 November 1971. The 2nd, 3rd and 4th counts alleged respectively that they conspired together to murder Mr. Ryon, to rob him with a deadly weapon, and to commit burglary of his dwelling. The remaining counts charged Brown and Tennant with various crimes against the person and property of Mr. Ryon. On 27 January 1972 the case was removed to the Circuit Court for Harford County for trial. Mrs. Ryon was separately tried. She went to trial before a jury under the 1st count for the murder of her husband, the conspiracy charges being severed. On 13 October 1972, she was convicted of murder in the first degree, and on 20 December 1972 she was committed to the custody of the Commissioner of Correction for the rest of her natural life.[10] This Court affirmed the judgment on direct appeal. *Ryon v. State*, No. 376, September Term, 1973, filed 11 June 1974, unreported, *cert. den.*, 272 Md. 747 (1974). On 30 June 1975 certiorari was granted by the Supreme Court of the United States. *Ryon v. Maryland*, 95 S. Ct. 2674. The judgment of the Court of Special Appeals

---

10. On 11 December 1972 the case as to Tennant was removed for trial to the Circuit Court for St. Mary's County. The final disposition of it does not appear in the record before us.

Brown was twice tried. At the first trial the jury could not agree upon a verdict, and the court declared a mistrial on 18 November 1972. Upon retrial, the jury found him guilty on 27 July 1973 of murder in the first degree.

was vacated and the cause remanded to that Court "for further consideration in light of *Brown v. Illinois.*"

Eleven contentions were raised in the original appeal to us. We found none merited grounds for reversal. We look again at the second contention as it relates to the mandate of the Supreme Court. In disposing of it we said:

> "The appellant's second complaint is that her confession should not have been admitted into evidence. [11] She does not bottom this claim upon *Miranda v. Arizona*, 384 U. S. 436. It is clear that there was full compliance with the safeguards prescribed by that case. At the hearing on the motion to suppress the confession, the State met its burden of establishing that the statement was freely and voluntarily made. * * * The appellant bases her contention, however, on two other premises. She complains initially that the statement followed an arrest for which no adequate probable cause was shown [12] It is firmly established in Maryland that a confession which is otherwise shown to have been voluntary is not rendered inadmissible by the fact that the accused was in custody under an illegal arrest at the time of making the confession. * * * It is furthermore clear that the rule enunciated in *Wong Sun v. United States*, 371 U. S. 471, does not control prosecutions in the courts of this state. * * * The lawfulness of the arrest is, therefore, a complete irrelevancy." (citations omitted) [13]

---

**11.** Mrs. Ryon's pretrial motion to suppress any confession or admission made by her was denied upon a plenary hearing before the trial on the merits. At the guilt stage of the trial, the State adduced evidence as to the voluntary nature of a confession obtained from Mrs. Ryon and it was admitted over objection. See Barnhart v. State, 5 Md. App. 222 (1968).

**12.** The second basis for the inadmissibility of the confession was that it should have been excluded because it was obtained "during a period of detention in violation of the Maryland and District Court Rules of Procedure." She attempted to analogize Maryland District Rule 709 to the rule of Mallory v. United States, 354 U. S. 449 (1957). We found that Rule 709 had not been offended.

**13.** The Court of Appeals of Maryland appeared to have dissociated itself

### The Facts Surrounding the Confession

We give a compendium of the evidence adduced at the hearing on the motion to suppress the confession. On 12

promptly from *Wong Sun*. In a long line of cases, starting with Prescoe v. State, 231 Md. 486, decided 24 May 1963, a majority of the Court indicated that *Wong Sun* was not intended to, and did not, control prosecution in state courts. Further, it did not consider a confession or admission to be the "fruit" of a search and seizure because it was not tangible evidence. See Stewart v. State, 232 Md. 318 (1963); Peal v. State, 232 Md. 329 (1963); Dailey v. State, 234 Md. 325 (1964), *cert. den.* 379 U. S. 975 and 384 U. S. 913; Bean v. State, 234 Md. 432 (1964); Mefford and Blackburn v. State, 235 Md. 497 (1964), *cert. den.*, 380 U. S. 937; Walker v. State, 237 Md. 516 (1965), *cert. den.*, 368 U. S. 960; McChan v. State, 238 Md. 149 (1965) *vacated* and *remanded*, 384 U. S. 893, *cert. den.*, 384 U. S. 1021; Streams v. State, 238 Md. 278 (1965); Taylor v. State, 238 Md. 424 (1965); Dailey v. State, 239 Md. 596 (1965), *cert. den.*, 384 U. S. 913; Crowe and Williston v. State, 240 Md. 144 (1965).

We, of course, followed those views. See, Nadolski v. State, 1 Md. App. 304 (1967), *cert. den.*, 247 Md. 741, 389 U. S. 1023; Howard v. State, 1 Md. App. 379 (1967); Stackhouse v. State, 1 Md. App. 399 (1967); Fisher v. State, 1 Md. App. 505 (1967); Boone v. State, 2 Md. App. 80 (1967); State v. Hill, 2 Md. App. 594 (1967); Tender v. State, 2 Md. App. 692 (1968); Speaks v. State, 3 Md. App. 371 (1968); Veihmeyer v. State, 3 Md. App. 702 (1968); Ervin v. State, 4 Md. App. 42 (1968), *cert. den.*, 251 Md. 748; Butina v. State, 4 Md. App. 312 (1968), *cert. den.*, 251 Md. 748; Jones v. State, 5 Md. App. 489 (1968); McDonald v. State, 10 Md. App. 258 (1970), *cert. den.*, 260 Md. 721; Mulligan v. State, 10 Md. App. 429 (1970); Wilkins v. State, 16 Md. App. 587 (1973), *affirmed*, 270 Md. 62, *cert. den.*, 415 U. S. 992.

In Carter v. State, 274 Md. 411, decided 11 April 1975, a unanimous Court of Appeals manifested some doubt as to its prior holdings. It noted, n. 9, at 431-432:

> "In the light of the holdings in Miranda v. Arizona, 384 U. S. 436 (1966), Davis v. Mississippi, 394 U. S. 721, 724 (1969), pointing out that there is no distinction under the Fourth Amendment between tangible and intangible evidence obtained after an illegal arrest, and in Michigan v. Tucker, 417 U. S. 433, 445 (1974), indicating that the statements of the defendant, as the 'fruits' of police conduct are within the defendant's Fourth Amendment rights, we must leave for another time the question of the continuing viability of our holdings in Prescoe v. State, supra, and its progeny."

The time swiftly came. In Everhart v. State, 274 Md. 459, decided three days after *Carter*, the Court characterized its statements with regard to the application of *Wong Sun* in state prosecutions as "dicta". *Id.*, n. 4, at 479-480. It declared that "such statements would now appear to have been erroneously gratuitous observations." We emphasize, as we indicated *supra*, that in Morales v. New York, 396 U. S. 102 (1969) the Supreme Court indicated that certainly all questions relating to detention and questioning had not yet been determined. See McDonald v. State, *supra*; Mulligan v. State, *supra*.

Whether statements of the Court of Appeals concerning the application of Wong Sun were erroneously gratuitous observations or not, the cases above cited manifest that the appellate courts of this State, adhered to a

November 1971, Detective William R. Johnson of the Prince George's County Police Department appeared before a Maryland District Court Commissioner and subscribed and swore to an application for a warrant to arrest Mrs. Ryon, Brown and Tennant. The application set out as a "concise statement of facts showing probable cause that defendants committed a criminal offense" that they "Conspired and did murder Samuel G. Ryon on or about November 6, 1971. It has been established through two confidential sources who talked with defendant Howard Brown and the confidential sources stated that Howard Brown indicated to them that he along with defendant Thomas Edward Tennant murdered Samuel G. Ryon and were paid to do so by defendant Minnie Sue Ryon." The formal charge was violation of Code, art. 27, §§ 407, 410 and 38. The Commissioner issued the warrant the same date. It was addressed to "Any law enforcement officer authorized to serve criminal process." It set out that the sworn application of Johnson alleged that Mrs. Ryon, Brown and Tennant "Did unlawfully and feloniously with premeditation and malice aforethought, murder Samuel Gardner [sic] Ryon." It formally charged violation of Code, art. 27, §§ 407, 410 and 38. It commanded the law enforcement officer to arrest the persons charged and to bring them before the Commissioner or some other judicial officer as required by law. It warned: "Hereof fail not or have you then and there the warrant." The warrant was endorsed over the signature of a Judicial Officer as returned on 13 November 1971. It showed that bond was not authorized and set a trial date of 15 November 1971. On the back of the warrant, addressed "TO THE PERSON

---

rule as to the admissibility of confessions which was not materially different from that followed in Brown v. Illinois, *supra*. The rule, although variously stated in the cases, is substantially that set out in Taylor v. State, 238 Md., at 429:

"We have repeatedly held that the admissibility, *vel non* of a confession is to be determined by whether, under the totality of the attendant circumstances, the confession was freely and voluntarily given. If freely and voluntarily given, it is admissible; if not, it is inadmissible. And neither the legality nor illegality of the arrest, although properly considered in the totality of the circumstances, is critical in a determination of the voluntariness of a confession."

ARRESTED", there were set out certain rights of an arrestee:

> "You do not have to say anything to anyone about any charge which has been placed against you, and anything you do say may be used against you in court.
>
> You have the right to consult with a lawyer before the police start questioning you and to have a lawyer present while the police are questioning you. If the police are questioning you and a lawyer is not present, you may have the questioning stopped so that you may talk to a lawyer. You also have the right to consult with your family or friends. If you are being questioned or held and you want to talk to your family or friends or to a lawyer, you will be allowed to use a telephone, if necessary.
>
> If you want a lawyer but cannot afford to pay for one, you may have the right to have one assigned to represent you free of charge, if the crimes with which you are charged are serious enough. A judge or a District Court commissioner or the Public Defender's Office can tell you whether you are eligible for a court-assigned lawyer.
>
> If you decide to give a statement, you still have the right to stop at any time so you may talk to a lawyer."

Each of Mrs. Ryon, Brown and Tennant signed the warrant as having read or having had read "to me the contents of the aforegoing document" and acknowledging receipt of a copy thereof. Detective Johnson certified over his signature that at 0245 hours on 13 November 1971 he had executed "the above warrant by arresting the defendant or personally delivering to him and leaving with him a copy of the warrant." [14] The back of the warrant also contained the "Statement and Certification of Initial Appearance before

---

14. After the signature of Tennant the time was given as 1:45 a.m.

Judicial Officer." The Judicial Officer certified that the initial appearance of the arrestees before him was on 13 November 1971 at 1:50 a.m., that he determined that the defendants were provided with a copy of the charging document and informed them of each offense charged, of the rights set out in the warrant, of the right to consult counsel and to contact family and friends, and that no statement need be made, but if one is made, it may be used against the maker in a court of law. See Maryland District Rule 706.

The homicide was investigated by Johnson and his superior officer, Lieutenant Detective James Fitzpatrick. It was stipulated:

"1. That the Defendant, Minnie Sue Ryon, was arrested at approximately 8:45 P.M. on November 12, 1971.

2. That she was taken to the Seat Pleasant Police Headquarters promptly and arrived there 15-20 minutes later.

3. That Mrs. Ryon was questioned by several officers and was taken before the Magistrate of her initial appearance at about 4 A.M. on November 13, 1971.

4. That from the time Mrs. Ryon arrived at Seat Pleasant until she was taken before the Magistrate the next morning, there were present there on duty two (2) judicial officers between the hours of 4:00 P.M. and 12:00 Midnight and one (1) judicial officer between the hours of 12:00 Midnight and 8:00 A.M.

5. The judicial officers who were there were authorized to perform all acts within the scope of their office, including hearing the initial appearance for an arrested defendant as required by Maryland Rules.

6. That at the time the Defendant was brought to police headquarters she had to walk past the office of the judicial officer to reach the detention room where she was questioned.

7. That about 4:00 P.M. November 12, 1971, a warrant was issued by a judicial officer for the arrest of Mrs. Ryon."

The testimony of Johnson and Fitzpatrick tended to show that they arrested Mrs. Ryon about 9:15 p.m. on 12 November 1971. They were aware that a warrant for her arrest had been issued and that it was required that she be brought before a judicial officer without unnecessary delay.[15] The warrant was not served on her when they first took her into custody. She was told that they were taking her to view some suspects. Johnson explained that one of the reasons she was told this was so she would be off-guard and another reason was that the officers did not want to embarrass her unduly. It was also felt that it would be easier to question her at the police station rather than to tell her what it was about at the time they arrested her. At Seat Pleasant she was told she was charged with murder. She was given the full *Miranda* warnings about 9:35 p.m. She gave both an oral and written statement. The taking of the written statement began about 10:00 p.m. and was concluded about 3:45 a.m. the next day. During the questioning she was calm, rational and "in control." She appeared to Johnson to be a reasonably intelligent person. There was no promises made or inducements held out for her to make a statement. She was not given a copy of the warrant until she went before the Judicial Officer.

Dr. Francis Carney, a full-time clinical psychologist at Patuxent Institution and a consultant to the Spring Grove State Hospital, testified in behalf of Ryon. He administered the Wechsler Adult Intelligence Scale and the Bender Gestalt and the Rorschach tests to her. These tests are to ascertain personality characteristics of an individual for the purpose of determining competency relating to criminal responsibility and sanity. On the tests, Mrs. Ryon had a verbal I.Q. of 60, and a performance I.Q. of 78, and a full

---

15. Fitzpatrick testified that Tennant, the first arrested, was taken into custody about 6:00 p.m. on 12 November 1971. Fitzpatrick at that time had the arrest warrant. Brown was arrested about 6:30 p.m.

scale I.Q. of 65. An individual with a full scale I.Q. of 65 is in the range of mild mental retardation. An individual who has mild mental retardation is a person who has difficulty in learning complex tasks, but is one who could learn simple kinds of tasks. Such individual is able to communicate in simple language, but complex or abstract thoughts will tend to be very difficult.

Mrs. Ryon, who claimed she had a ninth grade education, gave her version of the circumstances surrounding her confession. She was taken into custody on 12 November 1971 by police officers who told her they wanted her to identify two men. They did not tell her they had a warrant for her arrest. Prior to the questioning of her the officers told her that if she helped them, they would help her. It was her understanding that she would not be prosecuted. She signed a statement before her initial appearance before the Judicial Officer upon being told that if she did not sign "they could slip any kind of paper in between the papers." She had never been arrested before and her rights were not explained to her. Certain things in the statement were not the truth, and she did not use language like that in the statement.

Johnson was recalled and stated that Mrs. Ryon was made no promises. He denied that he told her he would make it easy for her. Fitzpatrick was recalled and denied that any promises were made to Mrs. Ryon. Following argument, the court denied the motion to suppress, finding that the confession was freely and voluntarily given without any inducement.[16]

### Application of the Law to the Facts

The arrest warrant was invalid because it lacked sufficient probable cause for its issuance. Any showing of probable cause must be gleaned from the statement in the application supporting the conclusion that Mrs.

---

16. Our compendium is, in material part, the version of the evidence adduced at the hearing given by Mrs. Ryon in the Statement of Facts in her brief on the original appeal. The Statement was "adopted in essence" by the State, and, we think, fairly reflects what appears in the transcript of the proceeding.

Ryon, Brown and Tennant conspired and murdered Mr. Ryon:

"It [the conspiracy and murder] has been established through two confidential sources who talked with defendant Howard Brown and the confidential sources stated that Howard Brown indicated to them that he along with defendant Thomas Edward Tennant murdered Samuel G. Ryon and were paid to do so by defendant Minnie Sue Ryon."

This may have satisfied the "basis of knowledge" prong of *Aguilar v. Texas*, 378 U.S. 108 (1964), but it was clearly wanting with respect to the "veracity" prong. See *Stanley v. State*, 19 Md. App. 507 (1974), *cert. den.*, 271 Md. 745. See also *Hearsay and Probable Cause: An Aguilar and Spinelli Primer;* by Judge Moylan of this Court, 25 Mercer L. Rev. 741 (1974). The State suggests that the "veracity" prong was satisfied upon an assumption that the confidential informants were not from the criminal milieu. See *King and Mobley v. State*, 16 Md. App. 546, 555 (1973), *affirmed, Mobley and King v. State*, 270 Md. 76 (1973); *Dawson v. State*, 14 Md. App. 18, 33 (1971). There is nothing, however, to show that the confidential source of the information here was not from the criminal milieu. If this was so, it was for the State to so show, and this it did not do. The arrest of Mrs. Ryon could not be justified by the warrant commanding it.

On the record before us, we are unable to find that the officer had probable cause for a warrantless arrest of Mrs. Ryon.

At the hearing on the motion to suppress, Fitzpatrick testified: "We had learned — or we had received information earlier that date, the 12th of November, from confidential sources that indicated the defendant, along with two other co-defendants, were responsible for the homicide and warrants were obtained based on that information." He explained what he meant by "being responsible": "Information had been received from a confidential source

who had been with co-defendant, Thomas Tennant and co-defendant, Harold Brown, when they discussed that on the night of November the 6th they entered the Ryon home, located at 1305 Ritchie Highway, and in fact had murdered Mr. Ryon in an agreement with Mrs. Ryon for his money." Of course, as we said in *Stanley*, at 510-511:

> ". . . the guidelines for the evaluation of hearsay information in a probable cause setting are the same whether a magistrate is contemplating the issuance of a warrant or whether a trial judge is weighing the propriety of a policeman's actions without a warrant."

See *Nadolski v. State*, 1 Md. App. 304, 308 (1967):

We observed in *Cleveland v. State*, 8 Md. App. 204, 218 (1969):

> "The general rule is that a warrantless arrest by a police officer is valid where he has probable cause to believe at the time of the arrest that a felony has been committed and that the person arrested committed it. * * * Probable cause exists in this context when the facts and circumstances within the knowledge of the arresting officer, or of which he had reasonably trustworthy information, are sufficient to warrant a reasonably cautious person in believing that a felony had been committed by the person arrested. * * * (citations omitted).

The same deficiency existed in the probable cause for a warrantless arrest as existed in the probable cause set out in the warrant. We hold that the arrest of Mrs. Ryon was illegal.

As we understand it, Mrs. Ryon's contention on appeal regarding the admissibility of her confession was not bottomed on any violation of the *Miranda* dictates. Therefore, the instant case has the same basic factual posture as did *Brown*. After the warnings prescribed by *Miranda* were given, a confession was obtained from an accused duing an interrogation by the police while the

accused was in custody as a result of an illegal arrest. As we have seen, *Brown* taught us that in state prosecutions a confession may be the fruit of an illegal arrest and that the giving of the *Miranda* warnings does not always purge the taint of such arrest. Under the mandate of the Supreme Court, the issue for decision on the appeal before us is whether, applying the rationale of the *Brown* holding to the facts and circumstances surrounding the obtaining of the confession from Mrs. Ryon, the confession was properly admissible or should have been excluded as the fruit of the illegal arrest.[17] Concisely stated, the issue is whether Mrs. Ryon's statement was obtained by exploitation of the illegality of her arrest.

We start with the proposition that the burden of establishing admissibility rests on the State. We conclude that even if the statement were voluntary under the Fifth Amendment by the giving of the *Miranda* warnings, the State failed to sustain its burden of showing that it was admissible in light of the distinct policies and interests of the Fourth Amendment as explicated in *Wong Sun*. That is, it was not sufficiently an act of free will to purge the primary taint of the illegal arrest as *Wong Sun* requires. 371 U. S. at 486. We reach this conclusion upon application of the relevant factors set out in *Brown*.

*The Temporal Proximity of the Arrest and the Confession*

Mrs. Ryon was taken to the police station by the arresting officers promptly upon being arrested, arriving there 15 to 20 minutes later.[18] It appeared that the questioning of her began immediately and that the written statement she gave

---

17. The Court in *Brown* did not define the retroactive application of the holding. It is manifest, however, from the mandate to us, that *Brown* applies at the least to cases not finally litigated at the time the decision was rendered. We said in Greene v. State, 11 Md. App. 106, n. 1, at 111 (1971), that a case is finally litigated when the time for direct appeal expires without an appeal having been taken, or if an appeal has been made, the date on which certiorari was denied by the Supreme Court of the United States, or the time to apply for certiorari has expired without application having been made.

18. According to the stipulation received in evidence, Mrs. Ryon was arrested at approximately 8:45 p.m. Fitzpatrick testified she was arrested at 9:15 p.m.

was the product of that interrogation. There was testimony at the hearing on the motion that the taking of the written statement began at 10:00 p.m., following the oral statement, and concluded about 3:45 a.m. the next morning. Thus, there was no appreciable time between the arrest and the oral statement, and the written statement was separated from the illegal arrest only by several hours. Essentially, in this respect, Mrs. Ryon's situation was remarkably like that of Toy in *Wong Sun* and Brown in his case.

## The Presence of Intervening Circumstances

There was no intervening event here of any significance whatsoever. It was only after the statements were obtained from Mrs. Ryon that she was taken before the Judicial Officer and given a copy of the warrant commanding her arrest.[19] Nothing occurred to so attenuate the connection between the illegal arrest and the statement as to dissipate the taint.

## The Purpose and Flagrancy of the Official Misconduct

Even if the arresting officers here truly thought that they had valid authority to arrest Mrs. Ryon under the warrant, the arrest was not without impropriety. "Promptly after his arrest the defendant shall be given a copy of the warrant by the arresting officer."[20] M.D.R. 706, § d. "An officer executing a warrant shall make prompt return thereof to the issuing officer or such other judicial officer as the warrant directs." M.D.R. 706, § f 2. The reasons for the non-compliance, more than the non-compliance itself, are significant in the instant case. Little weight should be given

**19.** The exact time of Mrs. Ryon's initial appearance before the judicial officer is not clear. According to the stipulation it was 4:00 a.m. on 13 November 1971. The judicial officer certified on the warrant that the initial appearance of the "defendant" was at 1:50 a.m. The certification does not show whether this referred to the initial appearance of any one of the persons arrested or all of them. Johnson certified on the warrant that he executed it "by arresting the defendant or personally delivering to him and leaving with him a copy of the warrant" at 0245 hours on 13 November 1971. Whether this included Mrs. Ryon is not known. Under Tennant's signature acknowledging receipt of the warrant, 1:45 a.m. is set out.

**20.** "A warrant shall be executed by the arrest of the defendant." M.D.R. 706, § f 1.

to the assertion that the officers did not want to embarrass Mrs. Ryon. They could have apprised her of the actual situation as soon as she was out of the presence of her friends and given her a copy of the warrant at that time. It is meaningful that they told her they were taking her to the police station to view some suspects, which was certainly not so. Even more determinative is the officers' admission that they told her this so that she would be off-guard. Significant also is the testimony that they felt it would be easier to question her at the police station rather than tell her what it was about at the time they arrested her. All of this, coupled with the fact that they did not take her before a judicial officer or give her a copy of the arrest warrant until after she confessed, compels the belief that the officers thought that a confession was essential to their case, and to that extent, at least, the arrest at that time was investigatory. The circumstances of the arrest give the appearance of having been calculated to cause surprise, fright and confusion to the end that an inculpatory statement would be made.

## Decision

On our independent constitutional appraisal of the record, we think that the causal connection between the illegality of the arrest and the confession was not broken. Rather, the confession was obtained by exploitation of the illegality. The confession was to be excluded as the fruit of the illegal arrest. We find that the State failed in its burden of showing that the confession was admissible under *Wong Sun*. In the light of *Brown v. Illinois, supra,* we hold that the trial court erred in denying the motion to suppress.

> *Judgment reversed; case remanded for a new trial.*