# JAMES LESLIE ADAMS, JR. *v.* STATE OF MARYLAND

[No. 1400, September Term, 1978.]

*Decided October 11, 1979.*

The cause was argued before MOYLAN and MACDANIEL, JJ., and HOWARD S. CHASANOW, Associate Judge of the Seventh Judicial Circuit, specially assigned.

*George E. Burns, Jr., Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Warren B. Duckett, State's Attorney for Anne Arundel County,* and *Ronald M. Naditch, Assistant State's Attorney for Anne Arundel County,* on the brief, for appellee.

CHASANOW, J., delivered the opinion of the Court.

The appellant was tried and convicted in the Circuit Court for Anne Arundel County of first degree rape, first degree sexual offense, burglary, and assault and battery. The charges arose out of an incident which took place on April 6, 1978, when someone broke into the victim's apartment, struck her with a blunt object, performed cunnilingus on her, and raped her. During the course of the assault, the victim engaged her assailant in conversation in an attempt to convince him that a friend was coming to see her and to dissuade him from harming her. At some point, the attacker gave his name as Gregory, and the victim falsely gave her name as Nancy. After the completion of the rape, the victim told her attacker, "God bless you, Gregory, for not hurting me anymore." Before leaving the victim's residence, her attacker said, "God bless you, Nancy."

In the course of the police investigation, the victim made a photographic identification, a voice identification, and a lineup identification; the latter two identifications are at issue here. On the morning following the attack, after reviewing an extensive number of photographs, the victim identified either four or six photographs of persons who resembled her attacker.[1] On April 14, 1978, the police attempted to secure

---

1. The testimony was inconsistent as to the exact number chosen.

a voice identification by placing telephone calls from the police station while the victim listened on an extension telephone which had the mouthpiece removed. A total of four telephone calls were placed; three in the morning and the fourth later that afternoon. The first two were made to police officers within the department; the third was placed to the appellant's telephone, but he was not at home; and the fourth call was placed that afternoon, again to the appellant's home. The police officer who placed the calls identified herself as a Miss Wetzel from the Department of Social Services and engaged the recipient of the call in conversation. By listening to the speech patterns, the victim was able to reject the first two, but identified the recipient of the fourth call as "Gregory," her assailant, as soon as he said, "Hello," on the telephone.[2]

On the same day the phone calls were made, the appellant was arrested and placed in a lineup with four other participants. The appellant was the only person in the lineup whose photograph was initially selected by the victim as one of the four or six persons who resembled her attacker. When the victim saw the men in the lineup, she identified the appellant as her attacker. As a further measure, each of the participants was asked to say, "God bless you, Nancy." The victim again identified the appellant's voice after the words were spoken.

The appellant objected to the admission into evidence of a statement blurted out by him at the time of his arrest. The arresting officer testified, over objection, that as the appellant was being arrested he stated, "You guys are hassling me again for something that occurred a week ago. I didn't have nothing to do with it and you guys are hassling me." The appellant contends that this statement was a product of an illegal arrest and should have been suppressed.

### The Maryland Wiretapping and Electronic Surveillance Act

The appellant first argues that the trial judge erred in admitting the testimony concerning the voice identification

---

2. Testimony established that the victim was a musician who had studied music and voice, and had taken several courses in voice in college.

made by the victim. The objection was based on the Maryland Wiretapping and Electronic Surveillance Act, Cts. and Jud. Proc. §§ 10-401 through 10-412 (1977) (1978 cum. supp.) (hereinafter referred to as the Act). Under the Act, Section 10-402 (a) (1) makes it unlawful to:

> "Willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire or oral communication."

Section 10-401 defines certain terms used in the Act. It includes the following definitions pertinent here:

> "(3) 'Intercept' means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device;
>
> (4) 'Electronic, mechanical, or other device' means any device or apparatus which can be used to intercept a wire or oral communication *other than*:
>
> (i) *Any telephone* or telegraph *instrument, equipment or facility, or any component* thereof, (a) furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business; or (b) being used . . . by an investigative or law enforcement officer in the ordinary course of his duties." (Emphasis added.)

Moreover, whenever any wire or oral communication has been intercepted in violation of the Act, ". . . no part of the contents of the communication and no evidence derived therefrom may be received in evidence . . . ." *Id.,* § 10-405.

The issue posed by the appellant is whether an extension telephone used at the direction of a police officer, in a police station under the circumstances of this case, constitutes an "electronic, mechanical, or other device" as defined in the Act. If the extension was furnished to the subscriber by a communications common carrier in the ordinary course of its business and was used by the subscriber or user in the

ordinary course of business or if the extension was used by an investigative or law enforcement officer in the ordinary course of his duties, the telephone extension would not be an "electronic, mechanical, or other device" as defined in the Act, and there would be no interception.[3]

It must first be noted that although the actual eavesdropping was by the victim, who was a passive, non-participating party to the telephone conversation, the victim was acting as an agent of a law enforcement officer. The victim was asked to go to the station to assist in the investigation and was asked to sit at the extension telephone to listen, and in that regard, the use of the extension was at the direction of and by an investigative or law enforcement officer.

The status of an extension telephone as a device for telephonic interception has been at issue in a number of cases under various statutes. The Federal Communications Act of 1934, 47 U.S.C. § 605, provided, in part, that "no person not being authorized by the sender shall intercept any communication . . . ." The United States Supreme Court in *Rathbun v. United States,* 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957), held that when a party receiving a phone call consents to the police using an extension telephone to listen to a conversation, there is no violation of the statute, since an extension telephone is not a device used for interception of messages. The Court noted:

> "The telephone extension is a widely used instrument of home and office . . . . The clear inference is that one entitled to receive the communication may use it for his own benefit or have another use it for him . . . . Common experience tells us that a call to a particular number may cause the bell to ring in more than one ordinarily used instrument. Each party to a telephone conversation takes the risk that the other party may have an

---

3. The state has conceded that the evidence admitted would constitute "contents" within the meaning of Section 10-401 (7) of the Act. Therefore, we will not consider that issue.

extension telephone and may allow another to overhear the conversation." 355 U.S. at 109-111.

The basis underlying the *Rathbun* decision has also been applied where the police listened in on the extension phone of the person who placed the call, rather than the one who received it. *See,* for example, *United States v. Pate,* 330 F.2d 126 (7th Cir. 1964), *cert. den.* 379 U.S. 891, 85 S.Ct. 165, 13 L.Ed.2d 95 (1964); *Ladrey v. Commission on Licensure to Practice,* 261 F.2d 68 (D.C. Cir. 1958), *cert. den.* 358 U.S. 920, 79 S.Ct. 288, 3 L.Ed.2d 239 (1958), where it was noted:

> "No one is bound to answer a ringing telephone. If he does pick up the receiver, he is not required to talk to the outside caller. If he chooses to talk, he may well understand that the calling party, the original 'sender' may have others listening to the conversation, whether in a group around the caller's telephone or on an extension attached to it." *Id.,* at 72-73.

In Maryland, the predecessor to our current Wiretapping and Electronic Surveillance Act provided, in part, that no person shall:

> "Obtain or attempt to obtain the whole or any part of a telephonic or telegraphic communication to which such person is not a participant by means of any device, contrivance, machine or apparatus, whether electrical, mechanical, manual or otherwise, unless consent is given by the participants." Md. Ann. Code, Art. 35, § 93 (a) (Repealed by Ch. 2, Laws of Maryland, Special Session, 1973.).

In *Clark v. State,* 2 Md. App. 756, 237 A.2d 768 (1968), *cert. den.* 394 U.S. 1001, 89 S.Ct. 1597, 22 L.Ed.2d 779 (1969), we noted that although the Maryland Act and the federal statute (47 U.S.C. § 605) differed in material aspects, we found the observations made in *Rathbun* applicable to Maryland despite the difference in statutory language:

> ". . . we do not believe that the Legislature intended to place a severe restriction on the ordinary usage

by subscribers of telephone extensions by denying the subscriber the right to allow a family member, an employee, a friend, or the police to listen to a conversation to which the subscriber is a party." 2 Md. App., at 765.

In *Clark,* an arson victim allowed the police to listen on a telephone extension in her home while she called the defendant in an attempt to elicit a confession from him. During one of these conversations, the defendant admitted his complicity in the crime and we held the police officer's testimony was properly admitted. In that opinion, Chief Judge Murphy noted:

"... the admissibility in evidence of the contents of a communication overheard on a regularly used telephone extension is not controlled by the provisions of the Maryland Wire Tapping Act, since the Legislature never intended that the use of such an extension telephone would be considered as a means for 'intercepting' or 'obtaining' a telephonic communication within the meaning of the Act . . . ." 2 Md. App., at 765-766.

In 1968, Congress passed a comprehensive electronic surveillance law in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 through 2520 (1970). Maryland followed suit, and in 1977 the legislature enacted a new Wiretapping and Electronic Surveillance Act, Cts. and Jud. Proc. §§ 10-401 through 10-412, which replaced our prior statute. The Maryland statute closely parallels Title III of the federal statute, *Smith v. State,* 283 Md. 156, 161, n.2; 389 A.2d 858, 861, n.2 (1978), *aff'd,* 61 L.Ed.2d 220 (1979), but it differs in several aspects, two of which may be pertinent to the instant case. These two differences arise in connection with interception of communications generally, found in the Maryland Act at § 10-402 and in the federal act at 18 U.S.C. § 2511. Federal law provides:

"(c) It shall *not be unlawful* under this chapter [18 U.S.C. § 2510 et seq.] for a person acting under color

of law to intercept a wire or oral communication, where such person is a party to the communication or *one of the parties* to the communication has given prior consent to such interception.

(d) It shall *not be unlawful* under this chapter for a person not acting under color of law to intercept a wire or oral communication where such person is a party to the communication or where *one of the parties* to the communication has given prior consent to such interception...." 18 U.S.C. § 2511 (2). (Emphasis added.)

In 1973, our legislature passed House Bill 962 which included these provisions allowing for interceptions when only one party consents. The Governor vetoed the bill, citing the two provisions and stating: "The very opportunity for unwarranted spying and intrusions on people's privacy authorized by this bill is frightening...." 1973 Md. Laws 1925. In 1977, the legislature again passed a wiretap act; this time with the following substitutes for the sections which the Governor found so offensive:

"(2) It is *lawful* under this subtitle for an investigative or law enforcement officer acting in a criminal investigation or any other person acting at the prior direction and under the supervision of an investigative or law enforcement officer to intercept a wire or oral communication in order to provide evidence of the commission of the offenses of *murder, kidnapping, gambling, robbery, any felony punishable under the 'Arson and Burning' subheading of Article 27, bribery, extortion, or dealing in controlled dangerous substances, or any conspiracy to commit any of these offenses,* where the person is a party to the communication or *one of the parties* to the communication has given prior consent to the interception.

(3) It is *lawful* under this subtitle for a person to intercept a wire or oral communication where the person is a party to the communication and where

*all of the parties* to the communication have given prior consent to the interception . . . ." Cts. and Jud. Proc. § 10-402 (c) (1977) (1978 cum. supp.) (Emphasis added.)

The effect of the changes in language is that an "interception" will be lawful only if *all* of the participants to the communication give their consent to interception. There is the exception, not applicable in this case, for an investigative or law enforcement officer acting with consent of only one of the parties, in order to provide evidence of certain designated crimes. Cts. and Jud. Proc. § 10-402 (c) (2) (1977) (1978 cum. supp.)

Thus, by making both participants' consent mandatory, our law has imposed stricter requirements for civilian monitoring than has federal law and in designating certain offenses where one party can consent to interception by a law enforcement agent, the legislature has restricted monitoring by investigative or law enforcement officers. *See,* R.P. Gilbert, *A Diagnosis, Dissection, and Prognosis of Maryland's New Wiretap and Electronic Surveillance Law,* 8 U.Balt.L.Rev. 183, 194 (1979); *Legislation, The 1977 Maryland Wiretapping and Electronic Surveillance Act,* 7 U.Balt.L.Rev. 374 (1978). We note that the crimes designated in the Act do not include any of the crimes with which the appellant was charged, so section 10-402 (c) (2) would not authorize interception with consent of only one party in the instant case. *Id.*

Although the federal and Maryland acts differ in these two respects, in the section which is dispositive of the issue before us, the federal and the Maryland acts are identical; both acts define the terms "intercept" and "electronic, mechanical, or other device," using the same language. Although the cases such as *Rathbun* and *Clark* were not decided under the current law, much of the underlying rationale for those opinions can be found in the statutory definitions.

The definition of intercept, as set forth above, includes the necessity for the use of an electronic, mechanical, or other device. Thus, some kind of "device" must be used, and for

example, to overhear a private conversation by the use of one's senses alone without the aid of an electronic, mechanical, or other device would not constitute an interception under the Act; nor would holding a telephone receiver away from one's ear to allow a third person to listen. In *United States v. McLeod,* 493 F.2d 1186 (7th Cir. 1974), the court held that a government agent who stood near the defendant while she placed a call on a public telephone and without any listening device overheard her end of the conversation, did not "intercept" a wire or oral communication.

The statutory definition of an electronic, mechanical, or other device as set out above, is an all inclusive one with certain listed exceptions. The exceptions for those instruments which do not constitute devices under the Act include any telephone instrument, equipment or facility, or any component thereof which is either furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of business; or a telephone instrument, etc. which is being used by an investigative or law enforcement officer in the ordinary course of his duties. Because the federal statute is identical to our own in the critical sections defining "intercept" and "electronic, mechanical, or other device" (Compare 18 U.S.C. § 2510 (4) and (5) with Cts. and Jud. Proc. § 10-401 (3) and (4)),[4] we may turn to the federal courts for guidance. With regard to the ordinary course of business exception, the appellant relies on *United States v. Harpel,* 493 F.2d 346 (10th Cir. 1974), for the proposition that "a telephone extension used without authorization or consent to surreptitiously record a private telephone conversation is not used in the ordinary course of business." *Id.,* at 351. However, the issue before that court was not simply listening in on an extension telephone, but was a surreptitious use of the extension telephone by the attaching of a suction cup to the instrument to record the conversation without authorization or consent

4. *See,* Gilbert, *A Diagnosis, Dissection, and Prognosis of Maryland's New Wiretap and Electronic Surveillance Law,* 8 U.Balt.L.Rev. 183, 192-193 (1979).

from either party. The court did not go so far as to hold that an extension telephone could never be used in the ordinary course of business, but rather that, "we do not feel a telephone used in the manner contemplated under the facts of this case is employed in the ordinary course of business." *Id.,* at 352. Other federal courts have dealt with the question of "ordinary course of business" and have held that the use of an extension telephone, even without the express consent of the parties, can under some circumstances be a use "in the ordinary course of business." In a marital or domestic setting, at least one federal court of appeals has stated that there was no prohibited interception when a person eavesdrops on a family member's telephone conversations by use of an extension telephone in the family home, since such use would be in the ordinary course of the user's business. *Anonymous v. Anonymous,* 558 F.2d 677 (2d Cir. 1977). In a recent case, a United States District Court held that a manager of a company, who had reason to believe one of his employees was acting in concert with an outsider to the detriment of the company, was acting in the ordinary course of business and consequently, there was no "interception" when he used an extension telephone to monitor a telephone conversation between two parties without their consent or knowledge. *Briggs v. American Air Filter Co., Inc.,* 455 F.Supp. 179 (N.D.Ga. 1978). The Tenth Circuit, which decided *Harpel,* implicitly reasoned that the degree of surreptitiousness was one factor to be considered in determining whether a telephone extension was being used in the ordinary course of business. *James v. Newspaper Agency Corp.,* 591 F.2d 579 (10th Cir. 1979), involved a newspaper organization which monitored telephone conversations of its employees in order to both protect against abuses by customers and also to aid in training and instructing employees how to better deal with customers. The court found the eavesdropping was not surreptitious, but was done with the advance knowledge of both management and employees, and was for a legitimate business purpose; therefore, there was no "interception" since the equipment was used in the ordinary course of business. The Florida Supreme Court has recently held that

there was no interception when a supervisor listened over a telephone extension to a conversation between her employee and a third party, where the employee gave her consent and where the eavesdropping was during business hours for a business purpose. The Florida Supreme Court upheld the trial court's conclusion that although the telephone eavesdropping was, in part, to "satisfy curiosity," the supervisor was acting in her official capacity, the eavesdropping was for the benefit of the employer, and it was therefore in the ordinary course of business. *State v. Nova,* 361 So.2d 411 (Fla. Sup. Ct. 1978).

The appellant contends that since the mouthpiece of the telephone extension was removed, it could not be a telephone instrument. The short answer to this contention is that the Act excepts any telephone instrument, equipment or facility, or any *component* thereof, and the mere removal of part of the telephone instrument does not convert the instrument into some other apparatus not covered by the telephone exception.

Another exception to the definition of "electronic, mechanical, or other device" is the investigative or law enforcement officer's use of a telephone instrument, equipment or facility, or any component thereof "in the ordinary course of his duties." Cts. and Jud. Proc. § 10-401 (4) (i) (b) (1977) (1978 cum. supp.). The construction of the term "in the ordinary course of his duties," as used in the Wiretapping and Electronic Surveillance Act, is one of first impression in the State of Maryland. The appellant cites *People v. Tebo,* 37 Mich. App. 141, 194 N.W.2d 517 (1971), in support of his contention that in the instant case, the activity in question was not in the ordinary course of the duties of the Annapolis City Police Department. In *Tebo,* the sheriff's department, as a matter of course, listened in on all phone calls made by inmates from the jail, allegedly for the purpose of limiting long distance telephone calls. During the defendant's trial, an undersheriff who eavesdropped on the defendant's phone conversation was allowed to testify as to the contents thereof. The court held that the evidence was erroneously admitted and further held that ". . . a police officer is acting in the ordinary course of his duties within 18 U.S.C.A. § 2510 (5) (a) when he acts under a duly authorized

court order or comes within 18 U.S.C.A. § 2511 (2) (c)." *Id.,* at 522.

We first note that in *Tebo* neither party to the conversation consented to the eavesdropping. In the instant case, since the victim was an agent of the police officer and had consent of one of the parties to the communication, the provision of 18 U.S.C. § 2511 (2) (c) would apply and under the *Tebo* rationale, the eavesdropper could be acting within the ordinary course of his duties.

However, the appellant cites *Tebo* for the proposition that under the Maryland Act, "in the ordinary course of his duties" should be read as meaning only when an officer acts under a duly authorized court order or comes within section 10-402 (c) (2), which authorizes interception with consent of one party to provide evidence of a limited number of designated crimes, none of which were committed by the appellant. The appellant's reading of the phrase is unduly restrictive. Since this is a matter of interpretation, we look to principles of statutory construction to determine the meaning of the phrase. A general rule of statutory construction is that a statute should be read and construed, if possible, so that no clause is rendered surplusage, superfluous, meaningless, insignificant or nugatory. *See, Mazor v. State Department of Correction,* 279 Md. 355, 369 A.2d 82 (1977); *Police Commissioners of Baltimore City v. Dowling,* 281 Md. 412, 379 A.2d 1007 (1977).

The Act authorizes law enforcement personnel to intercept, using any type of electronic or mechanical device, with one party's consent, to provide evidence of certain designated crimes under § 10-402 (c) (2). Therefore, it would seem that the language in § 10-401 (4) (i) (b), pertaining to the use of telephone equipment by law enforcement officers acting in the ordinary course of their duties, authorizes the use of telephone equipment in circumstances not covered by other sections of the Act, otherwise the language would be surplusage and superfluous. We find that under § 10-401 (4) (i) (b), the specific exception for telephone extensions and other telephone components gives broader latitude in the use of telephone instruments and components than is given for

the use of other types of electronic surveillance equipment, such as hidden microphones or tape recorders.

Clearly this section is not meant as a substantial loophole in the protection afforded by the Act. On the other hand, the section must be interpreted as giving some authorization to an investigative or law enforcement officer to use telephone equipment without the express consent of both parties. It is clear that the term "ordinary course of his duties" must include only lawful and proper activities and it is both a limitation as well as a protection.

In the instant case, the police were investigating a crime and attempting to apprehend the perpetrator. The manner in which the extension telephone was used was lawful and proper and was in the ordinary course of police duties. Used in such a manner, the extension phone does not constitute an "electronic, mechanical, or other device." Further, since the extension phone was not a "device" within the meaning of the Act, there was no "interception" and hence no violation of the provisions of the Act.

Inasmuch as the extension telephone was used by a police officer, acting within the ordinary course of duties, we need not and do not reach a decision as to whether, in the circumstances of the instant case, such use also falls within the exception for use of extension telephones or telephone equipment by the subscriber in the ordinary course of business.

### The Lineup

The appellant next argues that the trial court erred in refusing to suppress the evidence of the lineup. His grounds are twofold: first, that it was "based on the improper voice identification"; and second, that the appellant was the only one of the four or six people identified by the victim in the photographic display to be included in the lineup.

In order to determine the admissibility of an out of court identification, we look to the standard established by the United States Supreme Court. The Court has noted that the primary evil to be avoided in an out of court identification is a substantial likelihood of misidentification and ". . . it is the

likelihood of a misidentification which violates a defendant's right to due process . . . ." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381-382, 34 L.Ed.2d 401, 411 (1972). Reliability, not suggestiveness, is the linchpin in making the determination of admissibility and if in the totality of the circumstances there was no substantial likelihood of misidentification, the pre-trial identification is admissible, even if suggestive. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). In order to evaluate the likelihood of a misidentification, we must consider several factors including the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Neil v. Biggers, supra; Manson v. Brathwaite, supra; Foster and Forster v. State,* 272 Md. 273, 323 A.2d 419, *cert. den.* 419 U.S. 1036, 95 S.Ct. 520, 42 L.Ed.2d 311 (1974); *Godwin v. State,* 38 Md. App. 716, 382 A.2d 596 (1977), *rev'd other grounds,* 284 Md. 85 (1978); *Dobson v. State,* 24 Md. App. 644 (1975), *cert. den.* 275 Md. 747 (1975).

We consider these factors one by one. The victim was awakened by her assailant who was standing in front of her while she was in bed. The assailant remained in her apartment for a period of forty to forty-five minutes, during which time he performed cunnilingus on her and raped her. He was quite close to the victim and they engaged in conversation during the time he remained in her apartment. The victim testified that she saw side and full face front views of her assailant at the time of the attack and that she watched him "intently" on two separate occasions for a total of about four to five minutes. The victim gave a full and detailed description of her assailant to the police, as well as a thorough description of the qualities of his voice. When the victim viewed the lineup, she immediately identified the appellant as the man who raped her. After the initial physical identification, each man was asked to step forward and say, "God bless you, Nancy," whereupon the victim again positively identified the

appellant. The lineup took place on the evening of April 14, 1978, some eight days following the incident.

Although there may have been a degree of suggestiveness in the fact that the appellant was the only person in the lineup whose photograph was one of the four to six initially selected by the victim as resembling her assailant, the evidence clearly indicates that under the totality of the circumstances, the lineup identification was reliable, and there was no substantial likelihood of a misidentification. The trial court did not err in refusing to suppress the identification testimony.

## The Statement

The appellant's final argument is that the trial judge erred in admitting into evidence the appellant's statements following his arrest. The appellant contends that the statements resulted from an arrest which was illegal because it was based on a voice identification which the appellant contends was illegal. *Ryon v. State,* 29 Md. App. 62, 349 A.2d 393 (1975), *aff'd* 278 Md. 302 (1976). Having already decided that the voice identification was proper, we further conclude that there was ample probable cause for the arrest warrant to have been issued. The photographic identification, coupled with the victim's positive identification of the appellant's voice, established probable cause for the warrant to issue; therefore, the blurted out statements made by the appellant after the lawful arrest were properly admitted.

*Judgments affirmed.*
*Costs to be paid by appellant.*