CHARLES WILLIAM DAVIS, JR. *v.* STATE OF MARYLAND

[No. 650, September Term, 1978.]

*Decided June 6, 1979.*

The cause was argued before MELVIN, LISS and COUCH, JJ.

*Arnold M. Zerwitz, Assigned Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *George E. Burns, Jr., Assistant Public Defender,* on the brief, for appellant.

*F. Ford Loker, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General, Sandra A. O'Connor, State's Attorney for Baltimore County, Mark H. Kolman* and *Timothy J. Martin, Assistant State's Attorneys for Baltimore County,* on the brief, for appellee.

MELVIN, J., delivered the opinion of the Court.

On April 12, 1978, at a jury trial in the Circuit Court for Allegany County (Getty, J., presiding), the appellant, Charles William Davis, Jr., was convicted of murder in the first degree and the use of a handgun in the commission of that crime of violence. The murder victim was Mrs. Kathleen Cook, who was shot to death behind a shopping center parking lot in Baltimore County on the night of December 31, 1975. Mrs. Cook, with her husband, had gone to a night club located in the shopping center to meet some relatives and friends for a New Year's Eve party.

At trial, over appellant's objection and following pre-trial suppression hearings, appellant's oral confessions were admitted in evidence. The confessions were given to the police on September 4th and 5th, 1977. Those given on September 4th were recorded on tape in the appellant's own voice and transcribed. At trial the tapes were admitted in evidence and heard by the jury. The transcriptions were also admitted in evidence. The confession of September 5th was presented to the jury through the testimony of Maryland State Trooper David Horan. Testifying from notes made at the time, Trooper Horan related the appellant's detailed account, given at the scene of the crime, of how, on New Year's Eve 1975, the appellant had lured Mrs. Cook, thinking she was someone else, from the night club onto the parking lot of the shopping center, had sexual intercourse with her, beat her, fired four .38 calibre bullets into her body, and left the scene.

The appellant elected not to testify either at the suppression hearings or at trial, and otherwise presented no evidence to contradict the State's evidence concerning the *corpus delicti* of the crimes or his criminal agency.

On appeal his primary contention is that the judgments of conviction must be reversed because the trial judge erred in admitting his confessions into evidence. He does not contend here that his confessions were involuntary in the traditional sense or that any of his rights set forth in *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602 (1966) were violated so as to invoke the exclusionary rule enunciated in that landmark decision. He does invoke, however, two other exclusionary rules: 1) the Fourth Amendment exclusionary rule followed in *Ryon v. State,* 29 Md. App. 62, 349 A. 2d 393 (1975), *aff'd.* 278 Md. 302, and 2) the *per se* exclusionary rule adopted by the Court of Appeals in *Johnson v. State,* 282 Md. 314, 384 A. 2d 709, decided April 6, 1978, four days before the appellant's trial below and seven months after his confessions. The appellant argues that a proper application of either of these rules required the trial judge to exclude his confessions.

Related to the claimed applicability of the *Johnson* exclusionary rule is appellant's remaining contention that the

trial judge erred in failing to instruct the jury that it was up to them, the jury, to determine whether or not the rule of *Johnson* applied to this case.

After a careful review of the record we conclude that there is no merit to any of the appellant's contentions and we affirm the judgments of conviction.

# I

## *The Fourth Amendment Claim*

The relevant facts as presented to Judge Getty at a suppression hearing on March 13th, 14th and 15th, 1978, are as follows. On July 20, 1977, Maryland State Troopers David Horan and Gary Hartman were driving in Baltimore City when they passed the appellant Davis driving his Volkswagen in the opposite direction. Trooper Horan recognized Davis as an individual who had been questioned several months before in connection with the murder of Kathleen Cook, the victim in this case, and the August 24, 1976 murder of one Peggy Pumpian. Trooper Horan also had information that the license plates on the Volkswagen were "switch tags", *i.e.,* that they had not been issued to the Volkswagen Davis was driving. Trooper Horan turned around and followed Davis. A radio call to Maryland State Police Headquarters confirmed the fact that the license plates had been issued to another vehicle. Davis was stopped by the troopers for the motor vehicle violation. Davis admitted that he had switched tags and was told by Trooper Horan that citations for this and other motor vehicle violations (driving "without any registration plates at all" and "operating a vehicle without any insurance") would be issued. Trooper Horan then asked, "Can I search your vehicle, Charlie?" Davis consented to the search. There is no claim in this appeal that Davis did not voluntarily and willingly consent to the search or that the scope of the search of the vehicle was in any way limited by the consent given.

In the course of searching the inside of the Volkswagen, Trooper Hartman saw an uninstalled CB radio under one of the seats. He "grabbed a hold of it — and pulled it out — and since it wasn't attached to anything — just looked at the

serial number and jotted it down on the back, and then called it in for a check — to see if it was stolen." The information received back was that the CB radio was stolen. Davis was thereupon arrested for receiving stolen property. Subsequent investigation showed that the radio had been purchased with a stolen credit card belonging to the husband of one Carol Willingham. Mrs. Willingham was the victim of an alleged rape and robbery that occurred in Baltimore City on February 23, 1977, during the course of which the credit card was taken from her. Eventually Carol Willingham made a photographic identification of Davis as her assailant. On August 30, 1977, an arrest warrant was obtained from the Maryland District Court in Baltimore City charging Davis with the rape and robbery of Carol Willingham. In the meantime Davis had gone to Reno, Nevada, where he worked for an ambulance service.

On August 31, 1977, Troopers Horan and Hartman, accompanied by Marshall Feldman, Esq., an assistant State's Attorney for Baltimore City, traveled by airplane to Reno to obtain custody of Davis and return him to Maryland for trial on the Willingham rape and robbery charges. At approximately 1:20 A.M. on September 1, 1977, the Reno police, accompanied by Troopers Horan and Hartman, arrested Davis, advised him of his rights and placed him in the Reno jail. Before being taken to the jail Davis told Trooper Horan that he wanted to talk to him privately. The trooper replied that he was busy at that time but that "he [Davis] would get an opportunity later to speak with me if he wanted to". Later, during the same day, September 1, Trooper Horan went to the jail and asked Davis if he still wanted to speak to him. Davis said he did not and no questions were asked of him.

On the afternoon of September 2, Trooper Horan went to the Reno jail to photograph Davis. At this time Davis told the trooper that "about every six months — he did something big and he gets into trouble" and that there were "two things" he wanted to talk to the trooper about. However, after the trooper made arrangements for a room in which they could have privacy and after Davis had been given *Miranda*

warnings and asked again if he "wish[ed] to talk to me", he replied, "Only with a lawyer". No further interrogation took place. This was but one of several "false starts" during the next two days in which Davis, without prompting from the police, first indicated a desire to talk about the "two big things" [presumably the Cook and Pumpian murders] and then changed his mind.

On September 3, 1977, Davis appeared before a Nevada judge and waived extradition. The extradition hearing ended at approximately 10:15 A.M., at which time the troopers made arrangements to fly to San Diego, California to pick up an escapee from the Maryland House of Correction. They left Reno with Davis at approximately 1:30 P.M.

At 6:30 the following morning, September 4, the four men (Horan, Hartman, Davis and the escapee) left San Diego and after a short stop in Chicago, Illinois, arrived at Baltimore-Washington International Airport at 5:31 P.M. The troopers' intention was to then drive to Baltimore to deliver Davis to the Baltimore City Police Department. Before doing so they stopped at Jessup, Maryland, to deliver the escapee to the House of Correction. When they arrived at the prison, Trooper Hartman remained in the car with Davis while Trooper Horan took the escapee inside. While waiting in the car Davis told Trooper Hartman that he wanted to talk about the Pumpian homicide. When Trooper Horan arrived back in the car a few minutes later Davis again said he wanted to talk about the Pumpian homicide. Before making any statement Davis was advised of his *Miranda* rights. He then confessed to the Pumpian crime and agreed to repeat it on tape. He was then driven to the Waterloo Barracks of the Maryland State Police where at 6:43 P.M. his statements were recorded on voice tape. The taping session lasted until approximately 10:30 P.M. and included inculpatory statements concerning not only the Pumpian murder but the Kathleen Cook murder as well.[1] The transcript of the tapes shows that before making the statements Davis was fully advised of his *Miranda* rights

1. The record shows that all references to the Pumpian murder were edited out of the tapes and transcripts heard and seen by the jury.

and that he waived them. He was taken before a commissioner the following day at 7:00 P.M.

Davis claims in this appeal, as he did below, that his confessions were inadmissible under the doctrine of the fruit of the poisonous tree. *See Wong Sun v. United States,* 371 U. S. 471, 83 S. Ct. 407 (1963); *Everhart v. State,* 274 Md. 459, 337 A. 2d 100 (1975). The "poisonous tree", he argues, was the "seizure" [2] of the serial number of the CB radio at the time his Volkswagen was searched with his consent on July 20, 1977. Davis argues that this "seizure" was illegal because although he consented to the search of his automobile the police did not have probable cause to believe that the radio was stolen or was otherwise connected with any crime. From this premise he argues that there was no valid probable cause for the issuance of the arrest warrant charging him with the Willingham rape and robbery for which he was arrested in Nevada on September 1, 1977; that the arrest was therefore illegal; and that his confessions (nearly 4 days later) to the Cook murder following this illegal arrest were inadmissible.

For purposes of this appeal, we shall assume but not decide that Davis's Nevada arrest, for the reasons argued by him, was illegal. Even so, upon our mandated independent review of the record as a whole, we hold that the confessions were not barred by reason of that illegality. We base our holding upon application of the principles set forth in *Ryon v. State, supra,* wherein we said:

> "1) The Fourth Amendment exclusionary rule applies equally to statements and tangible evidence obtained following an illegal arrest or an otherwise illegal search and seizure.
>
> 2) Such statements are not rendered inadmissible simply because of the illegal arrest or unreasonable search and seizure.
>
> 3) Such statements are not rendered admissible

---

2. Appellant does not argue that the radio itself was permanently removed from his possession. Indeed the record shows that after Trooper Hartman removed the radio to inspect and record the serial number he immediately replaced the radio in the car where he found it. Davis complains here only of the "seizure" of the serial number.

simply because the Miranda warnings were fully given.

4) Admissibility of such statements, vel non, must be answered on the facts of each case, upon consideration of:

    (a) the voluntariness of the statement, which is a threshold requirement;

    (b) compliance with the Miranda safeguards, which is important in determining whether the statements were obtained by exploitation of the illegal conduct;

    (c) other relevant factors, such as
        (i) the temporal proximity of the arrest and the confession;
        (ii) the presence of intervening circumstances; and
        (iii) 'particularly, the purpose and flagrancy of the official misconduct.' " *Id.* at 71-72.

### Voluntariness of the Confessions

As already mentioned, Davis does not contend that the State did not fully meet its burden of showing that the confessions were voluntary under Fifth Amendment standards. There is not the slightest evidence that the confessions were the result of any coercion, threats, promises or undue influence on the part of the police.

### Compliance with Miranda safeguards

The record shows full compliance with the *Miranda* safeguards before Davis made his decision to confess, and there is no contention to the contrary.

### Other Relevant Factors

The arrest preceded the confessions by nearly four days. During that time Davis was not questioned at all concerning the Cook murder or the Pumpian murder. Judge Getty said

in his memorandum opinion following the March suppression hearing:

> ". . . The confession was separated from the arrest by a period of four days. The conversations that took place were initiated by the Defendant. He was before a Judge for the purpose of waiving extradition and made one or two phone calls to his girl friend from the west coast.
>
> Davis' decision to confess strikes the Court as a battle with his own conscience and not a result of impermissive actions by the two police officers. The tape recording indicates an atmosphere of quiet reflection and free expression." [3]

Regarding the "purpose and flagrancy of the official misconduct", we look to the police conduct that Davis contends tainted his confessions and rendered them inadmissible because of the Fourth Amendment exclusionary rule. Here the primary illegality, which we have assumed to exist, is the "seizure" of the CB radio serial number. We assume also (again without deciding) that the serial number led to Davis's photographic identification by Carol Willingham and his Nevada arrest and that the arrest itself was therefore illegal. Under the circumstances, however, we do not find that the assumed "official misconduct" was flagrant or engaged in with any improper motive or design.

In summary, with respect to Davis's claim that his confessions were inadmissible under the Fourth Amendment because they followed an illegal arrest, we find that the State has met its burden of showing that the causal connection between the illegal arrest and the confessions made subsequent thereto was broken, and that the confessions were "sufficiently an act of free will to purge the primary taint." *Wong Sun v. United States,* 371 U. S. 471, 83 S. Ct. 407 (1963); *Brown v. Illinois,* 422 U. S. 590, 95 S. Ct. 2254 (1975); *Ryon v. State, supra.*

---

3. Upon listening to the tapes ourselves we agree with the judge's assessment.

## II

### *The Johnson v. State Claim*

Following the suppression hearing of March 13th, 14th and 15th, 1978, Judge Getty denied the motion to suppress the confessions. On April 6, 1978, the Court of Appeals filed its opinion in *Johnson v. State, supra.* Based on the holding in *Johnson,* Davis renewed his motion to suppress and was permitted to argue as an additional reason for suppression the alleged violation of Maryland District Rule 723 a.[4] The motion was denied before trial on April 10, 1978.

In *Johnson,* the Court held that M.D.R. 723 a was mandatory, and, of more far reaching importance, that the sanction for violating its provisions was the exclusion of "any statement, voluntary or otherwise, obtained from an arrestee during a period of unnecessary delay in producing him before a judicial officer." The precise holding of the majority of the Court was as follows:

> "We therefore hold that any statement, voluntary or otherwise, obtained from an arrestee during a period of unnecessary delay in producing him before a judicial officer, thereby violating M.D.R. 723 a, is subject to exclusion when offered into evidence against the defendant as part of the prosecution's case-in-chief. A statement is automatically excludible if, at the time it was obtained from the defendant, he had not been produced before a commissioner for his initial appearance within the earlier of 24 hours after arrest or the first session

---

4. M.D.R. 723 a:

"A defendant who is detained pursuant to an arrest shall be taken before a judicial officer without unnecessary delay and in no event later than [the earlier of (1)] 24 hours after arrest [or (2) the first session of court after the defendant's arrest upon a warrant or, where an arrest has been made without a warrant, the first session of court after the charging document is filed]. A charging document shall be filed promptly after arrest if not already filed." (By Rules Order dated May 4, 1979, the Court of Appeals eliminated from the rule the words shown in brackets. The amendment becomes effective July 1, 1979.)

of court following arrest, irrespective of the reason for the delay."

* * *

"We note also that a truly spontaneous 'threshhold' confession or statement uttered at the time of arrest or shortly thereafter would not be excludible on the grounds that police *subsequently* failed to act diligently in complying with M.D.R. 723 a. In such cases there is manifestly no connection between the delay and the statement, and since police misconduct does not in any way contribute to the making of the confession, the exclusionary rule would logically not apply. *United States v. Mitchell,* 322 U. S. 65, 70, 64 S. Ct. 896, 88 L.Ed. 1140 (1944); *United States v. Seohnlein,* 423 F. 2d 1051, 1053 (4th Cir.), *cert. denied,* 399 U.S. 913 (1970); 1 C. Wright, *Federal Practice and Procedure* (Criminal) § 73, at 79-80 (1969)." *Id.* at 328-330.

The appellant argues that because the Maryland police obtained custody of Davis from the Nevada police at 1:30 P.M. on September 3, 1977 and was not taken before a judicial officer in Maryland until 7:00 P.M. on September 5, 1977 (more than 24 hours after obtaining custody),[5] the *Johnson* exclusionary rule operates to automatically exclude his confessions to the Cook murder. We do not agree. We explain as follows.

Davis was arrested in Reno, Nevada, only in connection with the Willingham rape and robbery. His arrest there was not related in any way to the Cook murder to which he subsequently voluntarily confessed on Sunday, September 4,

---

5. It was stipulated at the April 10th suppression hearing that during the period September 3rd (Saturday), September 4th (Sunday) and September 5th (Labor Day), there were no sessions of the District Court in Baltimore City or Baltimore County, but that a commissioner was on duty in both jurisdictions during that period. Thus, appellant argues the outer limit of the time period for presentment was 24 hours after the Maryland police obtained custody of him in Nevada.

1977, upon his arrival back in Maryland. Until that time, there was no occasion to take him before a judicial officer as "an arrestee" in the Cook murder case. Whatever duty the police officers may have had to comply with M.D.R. 723 a with respect to Davis as an arrestee in the Willingham case did not exist with respect to Davis as an arrestee in the Cook case until he in fact became an arrestee in the Cook case.

As pointed out by the majority in *Johnson,* "the purpose of the rule [M.D.R. 723] is to insure that an accused will be promptly afforded the full panoply of safeguards provided at the initial appearance." *Id.* 321. The Court then listed the principal protections afforded by the rule: 1) "a prompt hearing at which a neutral judicial officer must determine whether sufficient probable cause exists for the continued detention" of a defendant arrested without a warrant, *Id.* 321; 2) the obligation of the judicial officer "at the initial appearance to make a determination of the defendant's eligibility for pretrial release under M.D.R. 721", *Id.* 322; 3) the right of the accused to be informed "of every charge brought against him", *Id.* 322; 4) the right of the accused to be informed "of his right to counsel, and, if indigent, to have counsel appointed for him", *Id.* 322; and 5) the right of the accused "to request a full preliminary hearing" under M.D.R. 727 "where the defendant has been charged with a felony over which the District Court lacks subject matter jurisdiction." *Id.* 322. It is clear to us that those purposes could not have been accomplished with respect to Davis vis-a-vis the Cook murder charge until at least the time of his first oral confession concerning that crime. Until that time, he was a "defendant . . . detained pursuant to an arrest upon a warrant" (M.D.R. 723 a) that charged him only with the Willingham rape and robbery. As such a defendant he was entitled to presentment before a judicial officer without unnecessary delay to insure him of the enumerated protections afforded by such a presentment. Until he confessed to the Cook murder, however, his detention by the police was unrelated to that crime and presentment before a judicial officer would have been meaningless to him so far as that crime was concerned. For example, there would have

been no determination of probable cause to arrest for the Cook murder — for the simple reason that he had not been arrested for that crime; there would have been no determination of eligibility for pretrial release concerning the murder charge — because there was no such charge; he would not have been informed of the murder charge — because there was none; he would not have been informed of his right to have counsel assist him in defending against the murder charge — because he had not been so charged; and, of course, he would not have been informed of his right to request "a full preliminary hearing" on a charge that did not then exist.

We hold, therefore, that under the peculiar facts and circumstances of this case, appellant Davis did not occupy the position of an arrestee until he first confessed to the Cook murder. Only after that time can it be said that he was being detained (arrested) for that crime.

Davis's voluntary confession to the Cook murder was recorded on tape beginning at 8:25 P.M. on Sunday, September 4, 1977, at the Waterloo Barracks of the State Police in Howard County.[6] The record indicates that just prior to 8:25 P.M. he had expressed a willingness to talk about the Cook murder but the record does not show that he began making any meaningful inculpatory statements concerning that crime until 8:25 P.M.[7] The confession was completed at 10:30 P.M. In this case, therefore, we do not consider that Davis was an "arrestee" *for the Cook murder,* within the meaning of the *Johnson* exclusionary rule, until 10:30 P.M. on Sunday, September 4, 1977.

It is true that until that time he was being "detained

---

6. Prior to that time, beginning at 6:43 P.M., he had also recorded on tape statements concerning the Pumpian murder.

7. Actually, between 8:25 P.M. and 10:30 P.M. he confessed twice: once to Troopers Horan and Hartman and again, in further detail, in the presence of Troopers Horan and Hartman and Lieutenant Travers of the Maryland State Police. At the beginning of the second confession, Davis's girlfriend arrived at the Waterloo Barracks in response to a phone call he was allowed to make to her. She was allowed to remain in the room during at least part of the time Davis was confessing. Davis told her that "he was giving — [the police] a statement because it was bottled up inside of him and he was now getting it all off his chest."

pursuant to an arrest" (M.D.R. 723 a), but the detention was for a specific charge, of which he was made fully aware at the time of his arrest and which was totally unrelated to the crime to which he subsequently confessed. Until he did confess, there is no evidence that his detention was related in any way to the Cook murder or that the police initiated any discussion concerning it.

It is thus apparent that Davis's confession preceded, or at least coincided with, his "arrest" for the Cook murder. Viewed in this light, the confession was, in the words of the *Johnson* decision, "a truly spontaneous threshhold confession or statement uttered at the time of arrest or shortly thereafter" and is "not excludible on the grounds that police *subsequently* failed to act diligently in complying with M.D.R. 723 a", because "there is manifestly no connection between the delay and the statement, and since police misconduct does not in any way contribute to the making of the confession, the exclusionary rule would logically not apply." *Id.* at 329.

Aside from what we have already said concerning the application of the *Johnson* rule to Davis's confessions to the Cook murder, we think there is another reason why the *Johnson* exclusionary rule does not operate to exclude these confessions. M.D.R. 723 a obviously has no extraterritorial effect as a matter of law. Its provisions do not purport to tell law enforcement officers outside the State what to do — whether the officers be employed by Maryland or some other state. When a Maryland officer obtains custody of a person outside of Maryland his duties with respect to that person are, while he is still without Maryland's boundaries, not governed at all by M.D.R. 723 a because, as we said, the rule has no extraterritorial effect. Whatever duty the custodial officer may have to return his prisoner to Maryland for prompt presentment to a Maryland judicial officer derives not from M.D.R. 723 a but from the common law or from constitutional considerations of due process, or from the implications of the Uniform Criminal Extradition Act (Md. Ann. Code, 1957, 1978 repl. vol., Art. 41, § 16-43). None of these sources provide a *per se* exclusionary sanction for their violation such as the Court of Appeals has imposed for the violation of M.D.R. 723 a.

Since M.D.R. 723 a has no extraterritorial effect, it follows that its provisions cannot begin to operate until there is "a defendant who is detained *[in Maryland]* pursuant to an arrest *[in Maryland]."* (M.D.R. 723 a). In the present case, then, the earliest that M.D.R. 723 a could have come into play was 5:30 P.M. on Sunday, September 4, 1977. At that time, Davis came into Maryland and was then in the position of being detained pursuant to the Maryland arrest warrant that had been issued on August 30 in Baltimore City charging him with the Willingham rape and robbery. He was then clearly an arrestee with respect to those charges, but, as already stated, he did not become an "arrestee" vis-a-vis the Cook murder until 10:30 P.M. when he completed his taped confessions to that crime.

But even if we were to hold, with respect to the confessions to the Cook murder, that the time clock for measuring the commencement of the "period of unnecessary delay" began to run at 5:30 P.M. on September 4, we do not believe the *Johnson* exclusionary rule requires rejection of the confessions. It is true that Davis was not presented to a judicial officer for more than 24 hours after his arrival in Maryland. To that extent M.D.R. 723 a was violated. But as we read the *Johnson* exclusionary rule it operates to automatically exclude a defendant's statement only if, *"at the time it was obtained from the defendant" (Johnson, supra,* at 329), the period of delay in presentment had extended beyond 24 hours after arrest or beyond the first session of court after arrest, whichever was earlier. Because the confessions to the Cook murder in this case were given well within the applicable 24 hour period after "arrest" in Maryland they are not automatically excluded by the *Johnson* holding.

The question then becomes whether *at the time the confessions were obtained* a period of unnecessary delay in presentment had expired. Judge Getty found there was no unnecessary delay in presentment without regard to when the confessions were given. In the circumstances, we cannot say he was clearly erroneous [8] — and when the time of the

8. Since neither M.D.R. 723 a nor the *Johnson* exclusionary rule involves constitutional rights, we are not required to make an independent appraisal

confessions is considered (the first Cook confession was begun at 8:25 P.M., only 2 hours after Davis's arrival in Maryland), the correctness of his ruling admitting the confessions is manifest.

## III

Appellant's final contention is that the trial judge erred in refusing to instruct the jury that if they found that M.D.R. 723 a had not been complied with "the confession should not be considered by them as evidence and should be excluded." Judge Getty declined to give the instruction because he found the question "to be a matter of law". We think the judge was correct in his ruling.

Appellant asserts that, "Because *Johnson, supra,* in effect makes a confession obtained without compliance with M.D.R. 723 a 'per se' involuntary, this question like any other question of voluntariness must be decided by the juror [sic]." He argues from an incorrect premise. The *Johnson* per se exclusionary rule has nothing whatsoever to do with voluntariness, the Fifth Amendment, or any other constitutional right of criminal defendants. It operates upon "any statement, voluntary or otherwise" *(Johnson, supra,* at 328). Its purpose is purely to police the police and it was adopted expressly at the expense of the traditional voluntariness analysis. *Id.* at 325. We agree with the following statement contained in the State's brief:

> ". . . The situation is analogous to the questions of law surrounding admission of evidence claimed to have been obtained by an illegal search and seizure. Despite the Maryland constitutional provision establishing a criminal jury as the judge of the law and the fact, the preliminary ruling on the

of the issues; rather we are bound by the clearly erroneous rule. Md. Rule 1086.

admissibility of evidence remains a matter exclusively for the trial judge. *Brady v. State,* 373 U. S. 83, 89-91, 83 S. Ct. 1194, 1198, 10 L.Ed.2d 215 (1963); *Hepple v. State,* 31 Md. App. 525, 554, *aff'd,* 279 Md. 265 (1976); *Linkins v. State,* 202 Md. 212, 221 (1953)."

## IV

The State argues that the complete answer to the appellant's claim that *Johnson v. State, supra,* renders his confessions inadmissible is that the rule in *Johnson* should not be applied retrospectively to confessions obtained prior to the decision in that case. In *Shope v. State,* 41 Md. App. 161, 396 A. 2d 282 (1979), *cert. denied* March 23, 1979, we considered essentially the same argument and although we found considerable merit in the State's position, we nevertheless held that the *Johnson* rule applies to cases not "finally decided" at the time of the *Johnson* decision — even though the challenged confessions were obtained before that time. In view of our holding in the present case that even applied retrospectively the *Johnson* rule does not bar the confessions in this case, we shall not reexamine here our holding in *Shope.*

*Judgments affirmed.*
*Costs to be paid by appellant.*