Susan JANDAK, Plaintiff,

v.

The VILLAGE OF BROOKFIELD, Paul J. Schmidt, Individually and as Chief of Police of the Village of Brookfield, Illinois, John Doe, Richard Roe, and Other Unknown Agents of the Department of Police of the Village of Brookfield, Defendants.

No. 79 C 562.

United States District Court,
N. D. Illinois, E. D.

Aug. 12, 1981.

Edward L. Schuller, Donna, Gilman & Schuller, Chicago, Ill., for plaintiff.

Kevin R. Sido & John Church, John J. Pappas, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for The Village of Brookfield.

Paul E. Hamer, Brookfield, Ill., for John Doe and Richard Roe.

Memorandum

LEIGHTON, District Judge.

The novel issue presented by the unusual circumstances of this case is whether the tape recording of a personal telephone call placed by an on duty police officer on regularly recorded police lines violates Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520. Plaintiff Susan Jandak, recipient of the call, seeks actual and punitive damages from defendants Village of Brookfield and Paul J. Schmidt, the village's Chief of Police. The cause is before the court on defendants' motion for summary judgment, presenting numerous arguments, many of which reflect common misconstructions of the statute, and almost all of which lack

merit. Nevertheless, for the reasons stated below, the court concludes that defendants are entitled to summary judgment. Except where otherwise noted, the facts set forth below are undisputed, including all facts necessary for disposition of this motion.

I

Fred and Susan Jandak were married in 1967, and evidently had been experiencing marital difficulties for some time before the events giving rise to this litigation took place. In 1977, Fred came to the conclusion, which later evidence verified, that Susan was having an affair with Thomas J. Capaccio, a police officer for the Village of Brookfield. On January 1, 1978, an argument occurred between Fred and Capaccio at the Jandak residence, and Fred reported the disturbance to the Brookfield Police Department. Two days later, on January 3, 1978, Fred visited defendant Schmidt, Chief of Police, and requested him to intervene to prevent Tom from seeing Susan. Schmidt agreed to investigate.

Fred told Susan about his conversation with Schmidt and, later in the day, saw Capaccio's squad car in front of their home. This too he reported to Schmidt, who went to the Jandak's house, by which time the car was gone. When back at the police station, Schmidt noticed that Capaccio was on the phone, called Fred on another line, and asked him to call home to see whether the line was in use. Fred reported back that his line was busy. Schmidt, concluding that Capaccio was talking with Susan, directed his communications officers to log the time of the call. This one call, placed by Capaccio to Susan on January 3, 1978, gives rise to the litigation.

The Police Department of the Village of Brookfield has a communications system consisting of ten telephone lines installed by Illinois Bell Telephone Company.[1] The tele-

1. The evidence concerning the number of lines is in dispute. Capaccio indicates in his affidavit, filed earlier in opposition to a motion to dismiss, that there were seven lines. Chief Schmidt indicated in his deposition that there were nine lines. Defendants' brief, filed later than the affidavit or deposition, states that there are ten lines. The number of telephone lines is not relevant to disposition of this motion, but the dispute is indicative of the lack of thorough development and presentation of the evidence in this case.

phone company connected nine of the lines to a recording system. Conversations on these lines are regularly tape recorded, and eight of the lines are equipped with beeping devices to so notify parties to conversations. The ninth line, recorded without a beeping device, is used for investigative purposes. The tenth line is provided to employees to make personal calls, and is not monitored. Officer Capaccio placed the call at issue here on the regularly recorded line having no audible warning system.

Capaccio began working at the police department in November, 1974. His initial training included work as a communications officer, and he was assigned to the communications desk intermittently as part of his regular duties until he left the department in 1979. He had been assigned to the desk for a total of seventy-five days during the year preceding January 3, 1978. The tape recording equipment is contained in a cabinet near the communications desk, and one of the responsibilities of the officer manning that desk is to periodically change the tape.

Schmidt states, in an affidavit filed in support of the earlier motion to dismiss, that all police officers assigned to the communications desk are intimately familiar with the recording equipment. Schmidt indicated in his deposition that it was common knowledge that the line used by Capaccio was tape recorded. He also explained that which lines are recorded is designated on the inside face of the bottom panel of the tape recording equipment. Capaccio responds, in his affidavit, that his duties as Desk Officer required only that he change the tapes, which was a very brief operation. He states that he never listened to them, was not familiar with the care, maintenance or functioning of the equipment, and that there was no designation indicating which lines were being recorded. In his deposition, he specifically denies seeing any such designation. He believed that the only lines which were recorded were those equipped with warning devices, and selected the line he used to call Susan Jandak because he believed it was not recorded, since it had no warning device. He also

notes that the same line is provided to persons in custody for communicating with friends, family and counsel, a fact confirmed in Chief Schmidt's deposition.

Immediately after Capaccio completed the call to Susan, Chief Schmidt directed that the tape be removed. He contacted Jack Preston, Village Attorney at the time, and together they listened to a portion of the tape. Schmidt's secretary then transcribed the taped conversation. The tape and transcript were kept by Schmidt in a locked drawer, and he states that no one else saw them. Though Susan claims that the tape was played for others, she has offered only remote circumstantial evidence which could be otherwise explained.

That evening, Schmidt summoned Capaccio and suspended him for five days for violation of village and departmental regulations, specifically for conduct unbecoming an officer during the incident at the Jandak residence on January 1, and for use of the police phone for personal business. Capaccio appealed the suspension, and a public hearing was held before the Brookfield Board of Fire and Police Commissioners. After plea bargaining, Capaccio agreed not to contest the suspension. The tape was not played at the hearing, and afterwards it was erased and reused. The transcript was also destroyed. Susan Jandak filed this suit on April 25, 1979, just over one year later.

## II

Susan claims that defendants' tape recording and alleged replaying of her personal conversation with Capaccio resulted in her humiliation and embarrassment, and violated Section 2511 of the statute, which prohibits, in relevant part, any person from willfully intercepting a wire communication. 18 U.S.C. § 2511. She brings suit pursuant to Section 2520, which provides a civil remedy of actual damages, punitive damages and attorney's fees and costs for any person whose communication is intercepted in violation of the statute. Other relevant sections, limiting the scope of the statute, are discussed below as required for

consideration of the issues raised by defendants.

Congress enacted Title III for the dual purpose of protecting the privacy of wire and oral communications, and delineating the conditions under which such communications may be intercepted. S.Rep.No.1097, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.Code Cong. & Admin.News, pp. 2112, 2153 (hereinafter "Senate Report"). Title III is part of a crime control act, and its major focus is to clarify the confusion in the law governing surveillance and wiretaps by law enforcement officials by providing procedures for the use of electronic interception in combating criminal activities, particularly organized crime. Senate Report, *Id.* at 2153–7; *Simpson v. Simpson,* 490 F.2d 803, 806 (5th Cir.), *cert. den.* 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974); *Briggs v. American Air Filter Co., Inc.,* 630 F.2d 414 (5th Cir. 1980). Nevertheless, Congress was also concerned with the potential for widespread abuse of the tremendous scientific and technological developments in electronic surveillance techniques, and so broadly prohibited, with narrow exceptions, all interception of oral and wire communications. *See* Senate Report, *supra,* at 2154, 2156.

### III

■ Most of defendants' arguments in support of their motion for summary judgment may be generously described as specious, and quickly disposed of. The first argument which must be considered, though not the first put forward, is that this court lacks jurisdiction because Susan could not recover more than ten thousand dollars in damages. Defendants give a rather scurrilous and barely relevant rendition of Susan's past problems and activities, intended to indicate that she did not suffer any damages.[2] Susan's medical records and her deposition indicate that defendants' activities at least aggravated her problems,

and on this record the court could not conclude as a matter of law that she did not suffer over ten thousand dollars in damages. In any event, since Title III provides protection of civil rights, claims under the statute fall within the court's jurisdiction under 28 U.S.C. § 1343(4), which does not require a jurisdictional minimum. *Wright v. Florida,* 495 F.2d 1086 (5th Cir. 1974); *Kinoy v. Mitchell,* 331 F.Supp. 379 (S.D.N.Y. 1971); *By-Prod Corporation v. Eli Lilly & Co.,* No. 78 C 3627 (N.D.Ill. Jan. 26, 1981).

■ Defendants also argue that this suit should be barred by the doctrine of laches because plaintiff did not file suit for over a year after the incident. They allegedly are prejudiced by having destroyed the tape, which they did barely one month after the recording. Since the contents of the conversation are not in issue, no actual prejudice resulted. Furthermore, it is elementary that laches is an equitable doctrine, rarely applied in a legal action unless the elements of estoppel are present, and virtually never applied in a legal action to nullify the statute of limitations. Susan brought suit well within the statute of limitations, did not unreasonably delay, and the doctrine of laches cannot be reasonably argued, let alone applied, in this case.

■ Another argument made by defendants is based on the statutory defense of good faith reliance on a court order or legislative authorization. 18 U.S.C. § 2520. The "legislative authorization(s)" they allegedly relied on range from Title III itself to the telephone book. The statute has several exceptions and definitions limiting its scope, and defendants suggest that they relied on these exemptions, acting in a good faith belief that the act did not apply to their conduct.

However, defendants would then have relied, at most, on the absence of a prohibition; the statute could still not constitute the specific "authorization" that this defense requires. The statute would be ren-

---

**2.** These allegations need not be repeated here. The court was reminded of that old, but not venerable, lawyer's adage to the effect that when the law is against you, argue the facts; when the facts are against you, argue the law; and when both are against you, attack your opponent.

dered completely ineffective if anyone who claimed a good faith misconstruction of its terms was completely exempt. The statutory defense, on its face, was meant to exempt defendants who acted in good faith on a court order or legislative action specifically authorizing their conduct;[3] it does not exempt misinterpretation of the statute itself. *Campiti v. Walonis*, 611 F.2d 387 (1st Cir. 1979).

The other supposed legislative authorizations allegedly relied on by defendants are not specifically cited.[4] They note that each Illinois Bell telephone directory states that Illinois Commerce Commission regulations (which defendants fail to identify) do not require that recorded police lines have beeping devices. Also, as indicated by an exhibit of Illinois Bell service charges, the Commission has approved different rates for connection of lines with and without warning devices. Even if these unidentified regulations and tariffs are considered "legislative authorization(s)", they indicate only that in some circumstances the police may have recorded lines, an obvious proposition since, among other reasons, Title III does not prohibit recording a conversation if one party consents, 18 U.S.C. § 2511(2)(c), (d), and Illinois law specifically exempts police recording of emergency communications, Ill.Rev.Stat. ch. 38, § 14–3(d). The regulations simply do not address, let alone authorize, recording in the circumstances here. They do not constitute the legislative authorization necessary to invoke the statutory good faith defense in this case.

From the outset of this case, initially by way of affirmative defense and motion to dismiss, and now in their motion for summary judgment, defendants have relied on the case law and statutory exceptions permitting recording of a conversation if a party thereto consents. The statutory exceptions allow interception if "one of the parties to the communication has given prior consent." 18 U.S.C. § 2511(2)(c), (d). The exception reflects a line of cases, decided under the Fourth Amendment, allowing recording or eavesdropping by government agents or informers who were parties to the conversation or who were allowed to listen by explicit consent of a party to the conversation. Senate Report at 2182, citing *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); *Rathbun v. United States*, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957); *On Lee v. United States*, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952).

In this case, however, Capaccio denies any knowledge that the line he used was being recorded, and certainly did not consent to the recording. When considering a statute designed to protect privacy, a court must be reluctant to give expansive reading to the exceptions. In this instance, the difference between consent and implied consent is enormous, and allowing application of the consent exception when the victim did not know that the conversation would be recorded would distort the plain requirement of the statute of "prior consent". *See Campiti v. Walonis*, 611 F.2d 387 (1st Cir. 1979); *Crooker v. United States Department of Justice*, 497 F.Supp. 500 (D.Conn.1980).[5]

3. There is some debate concerning whether the common law good faith immunity defense afforded police officers in civil rights actions brought pursuant to 42 U.S.C. § 1983, found in *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), is also available in actions under Title III. *See Campiti v. Walonis*, 611 F.2d 387 (1st Cir. 1979); *Jacobson v. Rose*, 592 F.2d 515 (9th Cir. 1978), *cert. den.* 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979); *Zweibon v. Mitchell*, 516 F.2d 594 (D.C.Cir.1975), *cert. den.* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). Even if the defense is available to defendants here, they have not offered evidence which would entitle them to summary judgment on these grounds.

4. After independently researching for such authorization, to no avail, the court notes that Illinois law places significantly greater restrictions on electronic eavesdropping than Title III does. *See* Ill.Rev.Stat. ch. 38, §§ 14–1 *et seq.*, §§ 108A–1 *et seq.*

5. The court is aware that under this exception, "consent may be expressed or implied". Senate Report at 2182. However, as the examples given in the Senate Report indicate, the consent may be implied in fact, from surrounding circumstances indicating that the party knowingly agreed to the surveillance. Defendants here are asking that the consent be implied in law, if the party reasonably should have known. This

■ Incredibly, defendants also argue that Capaccio "consented" to the disclosure of the intercepted conversation by appealing his suspension and by failing to move to suppress the tape at the hearing. In addition to the fact that, as it turned out, no attempt to use the tape was made, and so such a motion was unnecessary, this argument is patently frivolous. Presumably, defendants would construe exercise of the right to appeal, regardless of defendant's intention, as consent to violation of constitutional rights. In any event, the legislative history specifically provides that retroactive authorization would not be possible under this Section. Senate Report at 2182. This is especially clear when the authorization is effectively coerced by the threatened use of the recording in judicial proceedings. *See Weiss v. United States,* 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298 (1939).

### IV

The crux of this case, presenting the most interesting and difficult questions, concerns Section 2510(5)(a)(ii) of the statute, 18 U.S.C. § 2510(5)(a)(ii), a Section which has caused considerable controversy and confusion in the courts, and has yet to be considered in circumstances similar to those presented here. As noted above, the statute prohibits, among other things, intercepting a wire communication. Subsection 4 of Section 2510 defines "intercept" as "the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device". 18 U.S.C. § 2510(4). Subsection 5, at issue here, defines "electronic, mechanical, or other device" as follows:

(5) Electronic, mechanical, or other device means any device or apparatus which can be used to intercept a wire or oral communication other than—

(a) any telephone or telegraph instrument, equipment or facility, or any component thereof,

(i) furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business; or (ii) being used by a communications common carrier in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties;

(b) a hearing aid or similar device being used to correct subnormal hearing to not better than normal.

Accordingly, the recording in this case would not constitute an interception, and so would not violate the statute, if it was done through the use of a telephone instrument, equipment or facility, or any component thereof, and if the equipment was being used by a law enforcement officer in the ordinary course of his duties. Whether, in the circumstances of this case, the recording system falls within the exemption in Subsection 5(a) and whether its use falls within Subsection 5(a)(ii) are the unique and dispositive issues remaining.

Unfortunately, the legislative history of the statute, *see generally Simpson v. Simpson,* 490 F.2d 803 (5th Cir.), *cert. den.* 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974); *United States v. Paul,* 614 F.2d 115 (6th Cir.), *cert. den.* 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980); *Briggs v. American Air Filter Co.,* 630 F.2d 414 (5th Cir. 1980), offers little assistance in addressing these questions. In the early draft of the bill, the exception applied only to extension telephones, and was then limited to extension telephones used in the ordinary course of business. *Briggs v. American Air Filter Co., Inc., supra* at 418. Some courts have suggested that where it is permissible to listen on an extension phone, it is implicitly permissible to record from the same instrument, minimizing or eliminating the

---

goes far beyond the language of the statute, or any indications in the legislative history, and the court declines to so expansively read the exception. The court also notes that a "reasonable expectation of privacy" is not required to bring an action for interception of wire communications. *Kratz v. Kratz,* 477 F.Supp. 463 (E.D.Pa.1979); *United States v. Banks,* 374 F.Supp. 321 (D.S.D.1974); *but see United States v. Paul,* 614 F.2d 115 (6th Cir.) (Phillips, J., concurring), *cert. den.* 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980).

distinction between extension phones and recording equipment, and focusing instead on the second question of whether the recording was in the ordinary course of business or duties. *See, e. g., Simpson v. Simpson*, 490 F.2d 803 (5th Cir.), *cert. den.* 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974); *Anonymous v. Anonymous*, 558 F.2d 677 (2d Cir. 1977). However, the view that recording through eavesdropping devices cannot be distinguished from listening on an extension telephone, and so is equally exempted by this section, has been soundly criticized and rejected. *See Kratz v. Kratz*, 477 F.Supp. 463 (E.D.Pa.1979). The limitation of the exception to "any telephone or telegraph instrument, equipment or facility, or any component thereof" cannot be so easily circumscribed, or the exception could easily swallow the prohibitions.

Nevertheless, it is clear from the language of the exception that it exempts more than just extension telephones. Indeed, if this were not so, the original language of the bill presumably would not have been altered. The court need not examine the full range of telephone equipment and components, or determine exactly which other such equipment falls within the exception, to determine that the telephone system, including its recording components, at issue in this case is exempted.

■ Police departments commonly have recording systems like that of defendants, due to the need to preserve and be capable of accurately recalling messages pertaining to emergencies or to official police business. To further these purposes, defendants engaged a communications common carrier to install a recording system, to record emergency and investigative calls, as an integral component of the communications system used by the police department in performing its duties to the public. Such a system indiscriminately and routinely records all activities on established designated lines, and is not comparable to the selective use of recording equipment to eavesdrop on a normally unmonitored telephone system in order to record specifically selected communications. There is little doubt that Congress

did not intend the statute to apply to routine recording of emergency and investigative calls as an integral component of a police station telephone system like that of defendants. Accordingly, the court concludes that the recording device used by defendants falls within the definition of telephone equipment or component as used in subsection 5(a).

■ It remains to be determined whether the equipment was used in this case "by an investigative or law enforcement officer in the ordinary course of his duties". 18 U.S.C. § 2510(5)(a)(ii). The act defines investigative or law enforcement officer to include officers of political subdivisions of states empowered by law to investigate or make arrests for offenses enumerated in the statute. 18 U.S.C. § 2510(7). The enumeration of offenses is contained in Section 2516, and generally covers serious offenses punishable by imprisonment for more than one year. 18 U.S.C. § 2516. Defendant Schmidt, as Chief of the Brookfield Police Department, is clearly empowered to investigate the enumerated offenses and consequently is an investigative or law enforcement officer under the act.

Considerable difficulty has accompanied attempts to define the scope of activity which may be considered as in the ordinary course of an investigative officer's duties. At the outset, an extreme position, adopted in some of the earlier decisions under the statute, must be rejected. The statute is designed to prohibit interceptions of wire and oral communications except in specifically defined circumstances, and to establish procedures for law enforcement officers to get court authorization of electronic eavesdropping in connection with investigation of designated serious crimes. *See U. S. v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). Some courts, considering the purposes of the statute and these carefully delineated procedures, have concluded that the exemption in Section 2510(5)(a) applies only to court authorized interception or to interception within the consent exception contained in Sections 2511(2)(c) and (d). *See, e. g., People v.*

*Tebo,* 37 Mich.App. 141, 194 N.W.2d 517 (1971); *U. S. v. Harpel,* 493 F.2d 346 (10th Cir. 1974). They have thus concluded that a law enforcement officer acts in the ordinary course of his duties only when the electronic interception is otherwise authorized by or excepted from the statute.

If this conclusion were correct, then there would be no need for the exemption contained in Section 2510(5)(a) since the interception would already be permissible; the conclusion renders Section 2510(5)(a) superfluous. This court, along with other courts which have concluded that Congress did not enact the section as mere surplusage, rejects this extremely narrow reading of the exemption. *Adams v. State,* 43 Md.App. 528, 406 A.2d 637 (1979), *aff'd* 289 Md. 221, 424 A.2d 344 (1981). *See Briggs v. American Air Filter Co., Inc.,* 630 F.2d 414 (5th Cir. 1980).

Defendants suggest an interpretation of the exemption at the other extreme, an interpretation rendered especially objectionable because defendants believe that the exemption applies to all eavesdropping equipment, a position already rejected by the court. Defendants argue that because Chief Schmidt had been asked and agreed to investigate police officer Capaccio's conduct, he was acting in the ordinary course of his duties when recording and listening to Capaccio's conversation. According to this theory, whenever a police officer is engaged in an investigation, and regardless of the kind of equipment he uses, he is exempted from the statute by this subsection.

If the statute did not apply whenever a law enforcement officer was acting in the ordinary course of his duties as this phrase is construed by defendants, then the whole statutory scheme, providing procedures and standards for when and how law enforcement officers may get court orders for electronic eavesdropping, would be rendered meaningless. The suggestion is particularly ludicrous when considering that officer Capaccio's offense was not even one for which

electronic interception would have been permissible by court order, since it was not punishable by imprisonment for greater than one year. This unduly broad reading of the exemption must be rejected.

Nevertheless, if the subsection is properly understood as exempting only certain limited kinds of equipment, then a relatively broad interpretation of the phrase "ordinary course of [a law enforcement officer's] duties" is permissible. Congress apparently concluded that law enforcement officers should have greater latitude when using telephone equipment than when using electronic intercepting devices. *Adams v. State,* 43 Md.App. 528, 406 A.2d 637 (1979), *aff'd* 289 Md. 221, 424 A.2d 344 (1981). This conclusion reasonably reflects the relative potential intrusiveness and clandestine use of the two types of equipment. Thus, Schmidt could not have used regular eavesdropping equipment to listen to and record Capaccio's call in the ordinary course of his duties, in part due to the prohibitions of the statute itself. However, the statute does exempt eavesdropping using certain limited kinds of telephone equipment, including that used in this case, where done in the ordinary course of a business or of carrying out the duties of a law enforcement officer.

The courts have several times had to determine what types of eavesdropping activities could be considered as done in the ordinary course of business or in the ordinary course of a law enforcement officer's duties. The cases turn narrowly on their facts, cannot be completely reconciled, and are each different than the case before the court. However, examination of these cases reveals two factors which primarily account for the decision whether the particular monitoring is within the language of the exemption. The courts emphasize whether the equipment was installed and used for proper business or investigative purposes, and the extent to which the eavesdropping was surreptitious, rather than with reasonable notice to the parties to the conversation that calls might be monitored.[6] The courts

---

**6.** The line of cases which suggests that consent, not just some degree of notice, is required, including *Harpel* and *Gerrard, infra,* have been distinguished or rejected recently by

have generally allowed monitoring where done for a clearly legitimate purpose with notice to the conversants, and have found violations of the statute where the parties had no notice of the possible monitoring or it was done for illicit purposes. In particular, monitoring to assure that the phones were not misused for private purposes or in violation of established regulations has been considered properly within the ordinary course of business or law enforcement duties.[7]

■ As discussed above, in connection with whether the equipment used in this case falls within Subsection 5(a), the reasons for installation and general use of this equipment were to improve police emergency and investigative services. The routine recording of all calls made on the investigative line was thus for reasons well within the proper scope of law enforcement. Furthermore, it must be concluded that Schmidt's decision to listen to the particular tape in issue, based on reasonable suspicions that police regulations—particularly those concerning private use of phones and conduct unbecoming an officer—were being violated, was justified by a proper law enforcement purpose.

■ The issue of whether notice was adequate is much more troubling. Capaccio states that he did not know the line was recorded, and that the line is used by persons in custody to communicate with, among others, their counsel. Schmidt states that all communications officers, including Capaccio, are familiar with the equipment, have access to a chart designating which lines are recorded, and commonly know that the line used by Capaccio was recorded. In other circumstances, such as where parties who are not communications officers of the police department are using the phone with authorization, the degree of notice provided here would be less than adequate. However, the record establishes that the monitoring of Capaccio was not surreptitious; rather, it was routine monitoring of all calls on the investigative line, with more than adequate opportunity for Capaccio to know of the monitoring. The court concludes that, in the unusual circumstances of this case, Capaccio should have known that calls on the line he used were

several courts. See Paul, Briggs, and James, infra. Harpel differs from the instant case because the monitoring in that case was completely surreptitious. Furthermore, as previously noted, requiring consent would render the subsection superfluous, since a specific consent exception is contained elsewhere in the statute.

7. See and compare Briggs v. American Air Filter Co., Inc., 630 F.2d 414 (5th Cir. 1980) (supervisor who listened to business call of employee, without notice, because call was to competitor, where supervisor had particular suspicions based on past conduct and warnings that employee was passing confidential information, was acting within ordinary course of business); United States v. Paul, 614 F.2d 115 (6th Cir.), cert. den. 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980) (monitoring of prison inmate calls for security reasons pursuant to federal policy statement and local prison rules, with posted notice to inmates, was within ordinary course of duties of correctional officer); James v. Newspaper Agency, 591 F.2d 579 (10th Cir. 1979) (company's use of telephone monitoring system to allow supervisors to monitor business calls and thereby protect against abusive calls and better train employees, with notice, was within ordinary course of business); Crooker v. United States Department of Justice, 497 F.Supp. 500 (D.Conn.1980) (routine and random monitoring of prison inmate calls for security and management purposes pursuant to published regulations and reasonable notice was within ordinary course of duties); Simmons v. Southwestern Bell, 452 F.Supp. 392 (W.D.Okl.1978), aff'd 611 F.2d 342 (10th Cir. 1979) (telephone company monitoring of testboard calls, for various proper business reasons, including preventing employees from using lines for private calls, and with full notice to employees, was in ordinary course of business); with Campiti v. Walonis, 611 F.2d 387 (1st Cir. 1979) (monitoring of specific prison inmate call, without regulations or notice and not routinely done, was prohibited by statute); United States v. Harpel, 493 F.2d 346 (10th Cir. 1974) (surreptitious recording of particular phone conversation not ordinary course of business); Gerrard v. Blackman, 401 F.Supp. 1189 (N.D.Ill.1975) (hospital's surreptitious monitoring of psychiatric patient's call to attorney not within ordinary course of business); United States v. Banks, 374 F.Supp. 321 (D.S. D.1974) (monitoring without notice of party line at Wounded Knee not for purpose of negotiating or any other legitimate purpose not within ordinary course of business).

monitored. Considering his training and job situation, that he should have known constitutes sufficient notice.

 Finally, there is no evidence in the record that plaintiff Susan Jandak had any reason to know that the conversation might be recorded. However, while she deserves considerable sympathy as a partly innocent victim of the circumstances, the blame lies with Capaccio and not with defendants. Just as a party to a conversation assumes the risk that the other party will consent to its recording, or will himself record it, so Susan must be held barred from recovery by Capaccio's misconduct. Once it is determined that the recording was done using telephone equipment or components in the ordinary course of a law enforcement officer's duty, the statute does not apply and defendants cannot be liable for whatever injury Susan suffered.

██ The court thus concludes that routine, nonsurreptitious, recording of a police investigative line which results in the recording of a conversation of an officer misusing the line for private purposes, where the officer should have known that the line was monitored, was in the ordinary course of the police chief's duties as a law enforcement officer, and is exempted from the statute by Section 2510(5)(a)(ii). The limits of this holding should be emphasized. In particular, the recording of prisoners' calls without notice, especially those to counsel, is an outrage and clearly cannot be considered as within the ordinary duties of a police officer. *Campiti, infra; Crooker, infra.*[8] The court simply concludes that defendants should not be held liable under the Omnibus Crime Control and Safe Streets Act as a result of Capaccio's unreasonable misuse of an official police line which is regularly recorded for proper reasons. Accordingly, for the reasons stated herein, defendants' motion for summary judgment is granted. This case is dismissed in its entirety.

So ordered.

8. Defendants have informed the court that the recorded line is no longer used for prisoners or other non-official parties.