THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HERBERT J. PITZMAN *et al.*, Defendants-Appellants.

Second District   No. 2—96—1168

Opinion filed November 19, 1997.—Rehearing denied January 2, 1998.

Joseph P. Condon, of Condon & Missimer, Ltd., of Crystal Lake, for appellants.

Gary W. Pack, State's Attorney, of Woodstock (Martin P. Moltz and Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE RATHJE delivered the opinion of the court:

The defendants, Herbert J. Pitzman and Randall E. Beu, were each charged in an amended indictment with 23 counts of eavesdropping (720 ILCS 5/14—2(a) (West 1992)) and 2 counts of conspiracy to commit eavesdropping (720 ILCS 5/8—2(a) (West 1992)). The case proceeded as a bench trial. At the close of the State's case, the trial court dismissed both conspiracy counts and all but six of the eavesdropping counts against each of the defendants. At the close of all the evidence, the defendants were each convicted of six counts of eavesdropping (counts VI, XIII, XIV, XV, XVI, and XVII). Following

a hearing on the defendants' posttrial motion, the trial court vacated the finding of guilty as to the convictions on counts VI, XIII, and XVII. On the remaining three counts, each of the defendants was sentenced to a term of 24 months' conditional discharge and ordered to pay a fine of $2,000 per count.

The defendants appeal their convictions and sentences, raising the following issues: (1) whether the telecommunications equipment in the Woodstock police department is an eavesdropping device under the statutory definitions; (2) whether the circumstances surrounding the tape-recorded conversations justified the claimed expectations that the conversations would be private; (3) whether the defendants possessed the requisite criminal intent; and (4) whether the sentence was excessive. Because the first issue raised is dispositive of this appeal, we will not address the remaining issues.

By way of background, at the time of the incidents from which these charges arose, Mr. Pitzman was the chief of police of Woodstock; Mr. Beu was a sergeant of the Woodstock police and was the assistant to Chief Pitzman. Both defendants had retired from the police department at the time of trial.

We summarize the pertinent testimony as follows. Prior to 1992, the Woodstock police department telecommunications room utilized a Dictaphone Model 5000 reel-to-reel tape logger; a telephone at the dispatch console equipped with a device known as "call check"; and two other telephones, which did not have call check. Any call to the police department that came into the console would be taped by both the dictaphone and the call check.

The significant difference between the logger and the call check was that the call check device recorded approximately 20 to 30 minutes of conversation and retained it for an hour or two. After the call check device was filled, it reset and recorded over the earlier recording. The recordings from the tape logger were retained.

The police department telephone lines, consisting of two 911 lines and four nonemergency numbers, were wired directly into the dictaphone logger. There were audible "beeps" on the lines to indicate that a call was being taped. Three other lines consisting of the chief of police's line, the detectives' line, and the 338-7799 (hereinafter 7799) line were not wired into the logger. The 7799 number was unlisted, and the dispatchers were required to answer that line with a simple "hello" rather than indicate to the caller that he or she had reached the police department. The 7799 line was intended to be used by members of the police department to avoid tying up the regular police department lines. However, if a call came in on the 7799 line through the console, it was recorded on the call check.

In December 1982, a memorandum from the then Woodstock chief of police, William Patrick, advised the employees that the dictaphone recorder was in full operation and further advised them as to the procedures to be followed with regard to changing or listening to a tape. The memorandum further provided as follows:

"As you know, all the telephone lines are taped with the exception of 338-7799. The line was intentionally left untaped to allow for personal calls, however, we request that you keep those calls brief and to a minimum."

At that time, the manual used to train the dispatchers also provided that 7799 was an "untaped line."

On February 10, 1988, Chief Pitzman issued "General Order Number 5E," which outlined the procedures to be followed in the event of "alarm calls." As part of the plan covering financial institution alarms, the order provided:

"Anytime Communications is contacting an establishment via telephone, an untaped line from the Communications console will be used."

The order further provided:

"A taped record of the call will be made available to the Investigative Division from the call check recorder at the radio console."

In March 1988, Brenda Nelson, at that time assistant supervisor in the communications area, sent out a memorandum to the communications personnel, advising them, in pertinent part, as follows:

"Reference use of 338-7799:

Keep personal phone calls to a minimum, especially during heavy traffic times, *i.e.*, day shift and afternoon shift. We have had numerous complaints ref. 7799 being busy for extended periods of time. Administration advises that if this continues, all lines in the dept. will be taped and will be reviewed on a regular basis. Disciplinary measures will then be taken against those who abuse this privilege."

Although the 7799 line was unlisted, the dispatchers received police-related calls, even some emergency calls, on the 7799 line. Brenda Nelson recalled that, when she would answer the 7799 line with a simple "hello," callers would be confused because they were trying to reach the police department. When Brenda would explain that it was the police department, callers would become irate that the line was not answered in a way that would let callers know they had reached the police department.

In 1991, a dispatcher at the Woodstock police department received a telephone call on a taped line reporting a chlorine leak at the Woodstock city swimming pool. Later, a member of the city council contacted the dispatcher regarding a problem with the police

response to the initial call. The city council member then complained to the city manager about the manner in which her complaint was handled by the dispatcher. Eventually, the matter was referred to Chief Pitzman.

Chief Pitzman ordered Christine Kutz, the communications supervisor, to locate the tape recording of the conversation between the dispatcher and the city council member. A check of the logger and the call check did not reveal a tape of that conversation. Chief Pitzman reported to the city manager that the call had been made on an untaped line (7799).

In June 1991, Dictaphone 5000 was replaced by the Veritrac 9000 in the communications room of the Woodstock police department. The installation was not completed until February 1992. The new logger had two functions, one being to record radio and telephone lines, and the other to play back the recordings. The new machine also had the capacity to record onto a standard size cassette tape.

The new machine also had the call check feature which was installed in February 1992. However, with the new machine, the call check was digital, meaning it could be played back instantly instead of having to rewind a tape. The call check was independent of the logging system. The call check was voice activated. It was limited to 20 minutes. After 20 minutes, it would start recording over the previous conversation.

Also, as of February 1992, the "beeps" that would audibly warn that a line was being taped had been eliminated from the system. According to Christine Kutz, in February 1992 when the installation of the 9000 machine was complete, she asked Sergeant Beu if she should circulate a memorandum regarding the new system to which Sergeant Beu responded that she should not worry about it.

At the time the 9000 machine was being installed in June 1991, George Staehling, who operates a business which leases and maintains business telephone equipment, performed work on the telephone equipment at the Woodstock police department. Mr. Staehling was informed that the department wished to connect the 7799 line to the tape logger, and a telephone jack needed to be installed for that purpose. Mr. Staehling was able to utilize an unused existing jack for that purpose. However, according to Mr. Staehling, he did not believe that the jack he used for the 7799 line had its modular plug connected to the dictaphone coupler, so it would not have been recording in June 1991.

According to Mr. Staehling, he received the order for the work in June 1991 from Christine Kutz, the supervisor of communications. However, Mr. Staehling also confirmed with Sergeant Beu that the 7799 line was to be recorded.

In February 1992, at the direction of Christine Kutz, Mr. Staehling hooked up seven lines, including the 7799 line to the tape logger.

The installation of the new equipment at the Woodstock police department was part of the plan for McHenry County to operate an enhanced 911 system. The McHenry County Emergency Telephone Systems Board (Board) operated the enhanced 911 system. The City of Woodstock was designated one of the "Public Service Answering Points" (PSAP). The Board selected and paid for the new equipment, as well as the installation of the equipment and the training of the dispatchers on it. An agreement, referred to as the "Intergovernmental Agreement" and dated January 20, 1992, was entered into between the Board and the City of Woodstock regarding call handling for enhanced 911 calls. The agreement provided in pertinent part as follows:

> "All calls of an administrative or non-emergency nature shall be referred to Woodstock's published non-emergency telephone number.
>
> The County of McHenry shall cause each McHenry County PSAP Center (including the County PSAP Center) to keep all records, times and places of all calls for a period of no less than one (1) year, except for recording tapes of all calls which shall be retained a minimum of no less than thirty (30) days. It shall be the responsibility of Woodstock to maintain the report of the call and the disposition of each call received."

In either January or February 1992, at a meeting with Dennis Anderson, assistant city manager, and David Danielson, City of Woodstock finance manager, Chief Pitzman advised that the enhanced 911 system was nearing completion and requested permission to add the nonrecorded line (7799) to the taping system on a permanent basis. In discussing the need for the line to be taped, the chief referenced the problem that had arisen with regard to the chlorine leak incident. Mr. Anderson asked if there was any reason to have an unrecorded line, and Chief Pitzman told him no. According to Mr. Danielson, Chief Pitzman also discussed the need to tape the 7799 line due to the increased requests for police services via that line. According to Mr. Anderson, he told Chief Pitzman to go ahead and record the line.

By April 1992, the new system was in operation. A telephone conversation could be recorded in the following ways. The reel-to-reel tape logger would record conversations on the telephone lines attached to the logger. Call check devices would record conversations on call-checked positions, one at the console and the second at Brenda Nelson's desk, since her telephone was E911 (enhanced 911 answering point). The third telephone was on Christine Kutz' desk; although

it was also an E911 point, it was not call checked. The fourth telephone was not an E911 answering point and was used for records. There is no indication that the 7799 line could not be accessed at any of the telephones, with the possible exception of the records telephone. The telephones in the communications room were close enough so that a conversation on any of them could be heard by anyone else seated at a telephone in the room.

Knowledge that the 7799 line was being recorded came about as the result of an incident referred to as the "Amati arrest." In the early morning hours of August 10, 1992, Bruce Hilstrom, a dispatcher for the Woodstock police department, received a request from Officer Charles Amati to dispatch a Spanish-speaking interpreter to the scene of a traffic stop. As a result of the inability to fulfill the request, Officer Amati called back on the 7799 line and made some derrogatory remarks regarding Sergeant Beu, who had been called to the scene of the traffic stop. Later that day, Sergeant Beu listened to the tape of Officer Amati's 7799 call and then had Chief Pitzman listen to the call. As a further result, Chief Pitzman then spoke to Officer Vasquez, the president of the Fraternal Order of Police of Police Lodge 191 for the City of Woodstock. Chief Pitzman requested that Officer Vasquez ask his membership not to use derrogatory remarks regarding a superior officer. According to Officer Vasquez, Chief Pitzman stated, "If you don't know it, all the lines in the police department are taped."

Following an investigation, Chief Pitzman, Sergeant Beu, and Christine Kutz were indicted on charges of eavesdropping and conspiracy to commit eavesdropping. In exchange for her testimony for the State, the charges against Mrs. Kutz were dismissed.

Following a bench trial, the trial court found the defendants guilty and sentenced them as indicated above.

■ The standard for review in this case is set forth in *People v. Collins*, 106 Ill. 2d 237 (1985). Under *Collins*, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Collins*, 106 Ill. 2d at 261.

A person commits the offense of eavesdropping when he:

> "(a) Uses an eavesdropping device to hear or record all or any part of any conversation unless he does so *** (2) in accordance with Article 108A or Article 108B of the 'Code of Criminal Procedure of 1963.' " 720 ILCS 5/14—2(a) (West 1992).

Section 108B—1(h)(1) of the Code of Criminal Procedure of 1963 defines an electronic criminal surveillance device or eavesdropping device as:

"[A]ny device or apparatus, including an induction coil, that can be used to intercept human speech other than:

(1) Any telephone, telegraph or telecommunication instrument, equipment or facility, or any component of it, furnished to the subscriber or user by a communication common carrier in the ordinary course of its business, or purchased by any person and being used by the subscriber, user or person in the ordinary course of his business, or being used by a communications common carrier in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties[.]" 725 ILCS 5/108B—1(h)(1) (West 1992).

■ The defendants contend that the equipment in question is not an eavesdropping device because it was installed as a part of a Public Service Answering Point and that the Administrative Code recommended that 911 calls be recorded. 83 Ill. Adm. Code § 725.503(e) (1992). They point out that section 108B—1(h)(1) specifically excludes from its definition of an eavesdropping device "[a]ny telephone *** or telecommunication instrument, equipment or facility, or any component of it, furnished to the subscriber or user by a communication common carrier in the ordinary course of its business, *** and being used *** by an investigative or law enforcement officer in the ordinary course of his duties." 725 ILCS 5/108B—1(h)(1) (West 1992).

The defendants also point out that the language of section 108B—1(h)(1) is strikingly similar to the language of section 2510(5)(a) of the Omnibus Crime Control and Safe Streets Act of 1968 (Act or federal Act) of the United States Code, which excludes certain devices from the definition of eavesdropping devices prohibited by the Act (18 U.S.C. § 2510 *et seq.* (1994)). The defendants cite *Jandak v. Village of Brookfield*, 520 F. Supp. 815 (N.D. Ill. 1981). In that case, the plaintiff brought suit against the village and its chief of police for recording a conversation between the plaintiff and a police officer with whom she was alleged to be having a love affair. The recording was made after the plaintiff's husband complained to the chief about the officer's conduct. The conversation took place on a telephone line that was regularly taped but had no beeping device on it as had the other taped lines in the police department.

The decision in the case turned on the exclusion contained in section 2510(5)(a) of the Act which, similarly to the Illinois statute, excluded from the definition of an eavesdropping device a telephone or other telecommunications equipment furnished by a communication common carrier and used by a law enforcement officer in the ordinary course of his duties. *Jandak*, 520 F. Supp. at 821. The district

court found that the equipment, which was installed by Illinois Bell Telephone Company and consisted of 10 telephone lines, 9 of which were connected to a recording system (with the tenth line untaped for personal telephone calls), was excluded under section 2510(5)(a) of the Act. However, it was then necessary to determine whether the equipment was used by a law enforcement officer in the ordinary course of his duties.

The district court noted that, on the issue of what types of eavesdropping could be said to be in the ordinary course of business, the courts have emphasized whether the equipment was installed and used for proper business or investigative purposes and the extent to which the eavesdropping was surreptitious, rather than with reasonable notice to the parties to the conversation that the call might be monitored. Monitoring of calls has generally been permitted where done for a clearly legitimate purpose with notice to the conversants; but courts have found violations of the statute where the parties had no notice of the possible monitoring or where it was done for illicit purposes. "In particular, monitoring to assure that the phones were not misused for private purposes or in violation of established regulations has been considered properly within the ordinary course of business or law enforcement duties." *Jandak*, 520 F. Supp. at 824.

The district court then stated as follows:

"As discussed above, in connection with whether the equipment used in this case falls within Subsection 5(a), the reasons for installation and general use of this equipment were to improve police emergency and investigative services. The routine recording of all calls made on the investigative line was thus for reasons well within the proper scope of law enforcement. Furthermore, it must be concluded that [the police chief's] decision to listen to the particular tape in issue, based on reasonable suspicions that police regulations—particularly those concerning private use of phones and conduct unbecoming an officer—were being violated, was justified by a proper law enforcement purpose." *Jandak*, 520 F. Supp. at 824.

On the issue of notice, the district court relied on the fact that, while the officer denied knowing that the line was taped, there was evidence that he was familiar with the equipment and that a chart was available to him showing which lines were taped. The court observed, however, that such notice would be less than adequate to those who were not communications officers but who were otherwise authorized to use the telephones. Further, because the line was routinely monitored, it was not a surreptitious monitoring of a particular individual's call. *Jandak*, 520 F. Supp. at 824.

In conclusion, the district court found that the routine, nonsurreptitious recording of a police investigative line which results in the recording of a conversation of an officer misusing the line for private purposes, where the officer should have known that the line was monitored, was in the ordinary course of the police chief's duties as a law enforcement officer and was exempted under the statute. 520 F. Supp. at 825; but see *Abbott v. Village of Winthrop Harbor*, 953 F. Supp. 931 (N.D. Ill. 1996).

Decisions of the United States District Court and the Court of Appeals are not binding upon state courts and are held to be no more than persuasive authority. *People v. Qualls*, 233 Ill. App. 3d 394, 397-98 (1992). The State maintains that federal cases provide no guidance to this court because Illinois law has traditionally been restrictive in its sanctioning of electronic eavesdropping devices. See *People v. Satek*, 78 Ill. App. 3d 543, 550 (1979); see also *Jandak*, 520 F. Supp. at 820 (district court noted that Illinois law places significantly greater restrictions on electronic eavesdropping than does the federal statute).

Nonetheless, we are inclined to be guided by *Jandak* in this case. While there are some factual distinctions between that case and the case before us, the discussion in that case of section 2510(5)(a) of the Act aids us here as the exclusion set forth in that section is similar to the exemption set forth in section 108B—1(h)(1).

We conclude that the evidence in this case established that the equipment in question satisfied the equipment definition portion of section 108B—1(h)(1). We further conclude that the equipment was being used by the defendants in the ordinary course of their duties as police officers.

On the issue of notice, there was a series of memoranda going back to 1982, which informed the employees that the 7799 line was untaped and designated for personal use. No memorandum specifically rescinding that policy was ever circulated to the employees. However, there was other evidence that indicated that the employees were on notice that the 7799 line was being taped at least at certain stations in the communications room. General order 5E advised that a recording from the 7799 line could be made. Brenda Nelson's memorandum of March 1988 informed the communications personnel that continued abuse of the 7799 line would result in it being taped; the memorandum gave no indication that prior warning that the line was being taped would be given. There was also testimony that under both the old and the new systems calls received at the console, even those on the 7799 line, were recorded on the call check.

As for the proper law enforcement purpose, the testimony in this

case indicated that, while there has been some discussion regarding the taping of the 7799 line during the 1980s, it was after the alleged mishandling of the chlorine leak incident that the taping of the 7799 line was seriously considered. Although under the enhanced 911 plan there was no intention to record nonemergency conversations, under the plan, it was desirous that all emergency calls be taped, even those that did not come in on the designated 911 lines. The testimony further concluded that calls received on the 7799 line were sometimes of an emergency nature.

The failure of the defendants in this case to circulate a memorandum of their intent to begin taping the 7799 line, which could be viewed as an oversight, does not, without more, translate into a criminal act. There is no evidence that the defendants taped the 7799 line for any illicit purpose whatsoever. On the contrary, the evidence clearly showed that the taping was commenced to ensure the proper recording of all emergency calls and, thus, was done in the ordinary course of the defendants' duties as law enforcement officers and in compliance with the intergovernmental agreement between the Board and the city.

Based upon the foregoing, we agree with the defendants that the equipment in this case was not an eavesdropping device, as it was exempted from the definition of such a device pursuant to section 108B—1(h)(1). Therefore, even viewing the evidence in the light most favorable to the State, we conclude that the State failed to prove the defendants guilty of eavesdropping beyond a reasonable doubt, and, thus, the defendants' convictions and sentences must be reversed.

The judgment of the circuit court of McHenry County is reversed.

Reversed.

DOYLE and THOMAS, JJ., concur.